Molly PERDUE, Plaintiff,

v.

**CITY UNIVERSITY OF NEW YORK, W. Ann Reynolds, individually and in her capacity as Chancellor of City University of New York, Brooklyn College, and Vernon E. Lattin, individually and in his capacity as President of Brooklyn College, Defendants.**

No. 93–CV–5939 FB.

United States District Court,
E.D. New York.

June 17, 1998.

Jennifer Freeman, Freeman Forrest & Chenetz LLP, New York City, for plaintiff.

Dennis C. Vacco, Attorney General of the State of New York by Jeanne Lahiff, Assistant Attorney General, New York City, for defendants.

### *MEMORANDUM AND ORDER*

BLOCK, District Judge.

Plaintiff, Molly Perdue (Perdue), the former women's basketball coach and women's sports administrator at Brooklyn College, brought suit against Brooklyn College, the City University of New York (collectively, except as otherwise indicated, referred to as CUNY), and the individually-named defendants, alleging violations of the Equal Pay Act (EPA), 29 U.S.C. § 206(d); Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000e *et seq.;* the Civil Rights Act of 1871, 42 U.S.C. § 1983; Title IX of the Education Amendments of 1972 (Title IX), 20 U.S.C. § 1681 *et seq.;* and the New York Human Rights Law, New York Executive Law § 296 *et seq.* Perdue alleged that the defendants discriminated against her on the basis of her gender during her employment.

By order of the Court (Gershon, J.) dated July 11, 1997, the complaint was dismissed in its entirety as to the individually named defendants, and Perdue's § 1983 and New York State Human Rights Law claims against CUNY were dismissed.

The following claims were tried before a jury, commencing on August 19, 1997:(1) EPA violations for the periods from September 8, 1986 through August 31, 1990, and September 1, 1990 through July 9, 1992; (2) Title VII intentional discrimination; (3) retaliation in violation of Title IX; and (4) hostile work environment sexual harassment in violation of Title VII. On August 28, 1997, the jury returned a verdict in favor of Perdue for willful violation of the EPA for the period from September 1, 1990 through July 9, 1992, and on her intentional discrimination claim. It rejected Perdue's remaining claims. The jury awarded Perdue $85,000 in compensatory damages for CUNY's intentional discrimination. The parties agreed that the Court should determine back pay.

There are four post-verdict matters now before the Court: first, whether within the purview of pre-verdict Rule 50(a) and post-verdict Rule 50(b) motions, CUNY is entitled to judgment as a matter of law for insufficiency of the evidence regarding the EPA and Title VII intentional discrimination verdicts and/or excessiveness of the compensatory damages award; second, in the alternative, whether a new trial should be granted pursuant to Rule 59(a), or a remittitur pursuant to Rule 59(e); third, if the EPA verdict stands, the amount of back pay which the Court should award, and other relevant remedial issues; and fourth, the amount of attorneys' fees and expenses to be awarded pursuant to 42 U.S.C. § 2000e–5(k) and 29 U.S.C. § 216(b).

For the reasons that follow, the Court: (1) denies CUNY's motions for judgment as a

matter of law and for a new trial or remittitur; (2) awards Purdue $134,829 in back wages, $5,262 in unpaid retirement benefits, and $134,829 in liquidated damages, in addition to the $85,000 in compensatory damages, for a total of $359,920, plus prejudgment interest on the back pay and compensatory damages in the sum of $83,264.94 through May 31, 1998, and $43.25 *per diem* to the date that judgment is entered; and (3) awards Perdue attorneys' fees in the amount of $339,399.60 and expenses in the amount of $16,982.19, to be divided as set forth below between her former counsel, Marcus Montgomery P.C. (MM), and her current counsel, Freeman Forrest & Chenetz LLP (FFC).

## I. CUNY'S MOTION FOR JUDGMENT AS A MATTER OF LAW

At the close of Perdue's case, CUNY moved for judgment as a matter of law pursuant to Rule 50(a) of the Federal Rules of Civil Procedure, contending that: (1) there was insufficient evidence to support Perdue's hostile work environment claim; and (2) there was insufficient evidence to support Perdue's EPA claim because the individuals whom Perdue contended held comparable positions, Mark Reiner (Reiner) and Ron Kestenbaum (Kestenbaum), had significantly more experience than Perdue.[1] The Court denied CUNY's motion. At the close of all of the evidence, CUNY again moved for judgment as a matter of law on the same grounds. The Court reserved decision. After the jury returned its verdicts, the Court continued to reserve decision on that branch of the 50(a) motion pertaining to the EPA claim.

Notwithstanding the pendency of its 50(a) motion, CUNY addresses the sufficiency of the evidence in regard to the EPA claim in its 50(b) post-verdict motion, contending that:

---

1. The colloquy between defendant's counsel and the Court on defendant's Rule 50(a) motion at the close of plaintiff's case in respect to the EPA claim was as follows:

CUNY: As for the equal pay issues, there has been substantial evidence that Mr. Reiner and Mr. Kestenbaum had significantly more experience than Miss Perdue.

THE COURT: It is really a factual issue. There is also testimony that these are compara-

ble positions, and we had some experts testify as well. ***

THE COURT: What else? So you are prepared to go forward with your case?

CUNY: Yes.

Tr. 8/25/97 at 11–13. (Citations to the trial transcript ("Tr.") refer to the date of the hearing and the page reference).

(a) the evidence did not establish that Perdue was performing the same job duties performed by both Kestenbaum and Reiner from September 1, 1990 through July 9, 1992, under similar working conditions; and (b) the evidence was insufficient to support a finding of willfulness. In respect to the compensatory damages award, CUNY argues in its 50(b) motion that: (a) Perdue failed to present any evidence that she suffered any pain or mental anguish; and (b) the causal relationship between the conditions of Perdue's employment and her gender was not supported by the evidence.

## A. The Applicable Legal Standard for a Motion for Judgment as a Matter of Law

The same standard applies to a Rule 50(a) motion for judgment as a matter of law and a Rule 50(b) renewed motion for judgment as a matter of law. *See Raspente v. National R.R. Passenger Corp.*, 111 F.3d 239, 241 n. 3 (2d Cir.1997); *Colwell v. Suffolk County Police Dep't*, 967 F.Supp. 1419, 1423 (E.D.N.Y.1997). However, a Rule 50(b) motion " 'is limited to those grounds that were specifically raised in the prior [Rule 50(a) motion].' " *Galdieri–Ambrosini v. National Realty and Dev. Corp.*, 136 F.3d 276, 286 (2d Cir.1998) (quoting *McCardle v. Haddad*, 131 F.3d 43, 51 (2d Cir.1997) (other internal quotations omitted)): *see* Fed.R.Civ.P. 50(b); *see also Holmes v. United States*, 85 F.3d 956, 962 (2d Cir.1996); *Lambert v. Genesee Hosp.*, 10 F.3d 46, 53–54 (2d Cir.1993). Pursuant to this specificity requirement, the Rule 50(a) motion "must at least identify the specific element that the defendant contends is insufficiently supported." *Galdieri–Ambrosini*, 136 F.3d at 286. The purpose of the specificity requirement is " 'so that the responding party may seek to correct any overlooked deficiencies in the proof.' " *Id.* (quoting Fed. R.Civ.P. 50 Advisory Committee Note (1991)).

A Rule 50(a) or (b) motion may only be granted if "the evidence, viewed in the light most favorable to the opposing party, is insufficient to permit a reasonable juror to find in her favor." *Galdieri–Ambrosini*, 136 F.3d at 289; *see Vermont Plastics, Inc.*

*v. Brine, Inc.*, 79 F.3d 272, 277 (2d Cir.1996) ("Judgment as a matter of law . . . is appropriate when drawing all reasonable inferences regarding the weight of the evidence and the credibility of witnesses in favor of the [non-movant], a reasonable jury could only have found for the [movant].") (internal quotation omitted). This can materialize only if "there is such a complete absence of evidence supporting the verdict that the jury's finding could only have been the result of sheer surmise and conjecture, or if the evidence is so overwhelming that reasonable and fair minded persons could only have reached the opposite result." *Lambert*, 10 F.3d at 56 (internal quotations omitted); *see Galdieri–Ambrosini*, 136 F.3d at 289. In making its determination, the Court "must give deference to all credibility determinations and reasonable inferences of the jury, and it may not itself weigh the credibility of witnesses or consider the weight of the evidence." *Galdieri–Ambrosini*, 136 F.3d at 289 (citing *Vasbinder v. Ambach*, 926 F.2d 1333, 1339–40 (2d Cir.1991)).

## B. Equal Pay Act Claim

### 1. Elements of an Equal Pay Act Claim

Pursuant to 29 U.S.C. § 206(d), the EPA is violated if an employer of a covered employee, such as Perdue, pays wages to that employee

[ (1) ] at a rate less than the rate at which he pays wages to employees of the opposite sex . . . [ (2) ] for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and [ (3) ] which are performed under similar working conditions . . . .

In other words, "[a] violation occurs when an employer pays lower wages to an employee of one gender than to substantially equivalent employees of the opposite gender in similar circumstances." *Pollis v. The New Sch. for Social Research*, 132 F.3d 115, 118 (2d Cir.1997). To show a violation of the EPA, a plaintiff need not prove that an intention to discriminate on the basis of gender motivated the pay disparity. *See id.; Tomka v. Seiler Corp.*, 66 F.3d 1295, 1310 (2d Cir. 1995).

■ Where there is a willful violation of the EPA, the resulting compensatory award should be doubled as liquidated damages. *See* 29 U.S.C. §§ 216, 260; *see also Pollis,* 132 F.3d at 120; *Bonner v. Guccione,* 1997 WL 362311, at *15 (S.D.N.Y. July 1, 1997). A violation of the EPA is willful if " 'the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute.' " *Pollis,* 132 F.3d at 119 (quoting *Reich v. Waldbaum,* 52 F.3d 35, 39 (2d Cir.1995)). It is not necessary for a plaintiff to show that an employer acted with intent to discriminate or in bad faith. *Id.; see Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 126 n. 19, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985).

*2. The Verdict and Supporting Evidence*

In its jury charge, the Court instructed that:

> in order to sustain her burden of proof in this case that she was discriminated against on the basis of sex in her pay, Perdue must prove each of the following by a preponderance of the evidence. One, that CUNY paid different wages to Perdue's claimed male counterparts. Two, that Perdue and her claimed male counterpart performed equal work on jobs requiring equal skill, effort, and responsibility. And three, that the jobs were performed under similar working conditions.

Tr. 8/28/97 at 19. The Court further instructed the jury that it was "to compare Perdue to both Reiner and Kestenbaum for the period of September 1, 1990 to July 9, 1992." Tr. 8/28/97 at 19. Included in the interrogatories presented to the jury on the Court's special verdict form were the following questions:

> Question 3: For the time period from September 1, 1990 to July 9, 1992, do you find that Perdue proved by a preponderance of the evidence all three elements of her claim under the Equal Pay Act?

> Question 4: Do you find that CUNY proved by a preponderance of the evidence its affirmative defense that the differential was based on a factor other than sex and therefore, there was a legitimate basis for the wage disparity?

> Question 5: Do you find that CUNY's conduct was in willful violation of the EPA during the time period from September 1, 1990 to July 9, 1992?

The jury answered "YES" to Questions 3 and 5, and "NO" to Question 4, thereby finding that: (1) Perdue proved all three elements of her EPA claim; (2) CUNY did not prove its affirmative defense; and (3) CUNY's conduct was in willful violation of the EPA. Drawing all reasonable inferences in favor of Perdue, as the Court must, the record is replete with evidence supporting the jury's factual findings with respect to Perdue's EPA claim.

*a. The Jury's Verdict Regarding the Elements of Perdue's EPA Claim for the Period from September 1, 1990 through July 9, 1992, and CUNY's Affirmative Defense*

■ In regard to CUNY's contention that the evidence does not establish that Perdue satisfied all three elements of her EPA claim for the time period from September 1, 1990 through July 9, 1992, and that CUNY did not prove its affirmative defense, the Court notes, preliminarily, that CUNY's Rule 50(a) trial motion was seemingly restricted to its contention that Perdue did not have comparable work experience to either Reiner or Kestenbaum, in contradistinction to the more pervasive concerns upon which an EPA claim must be evaluated. Nonetheless, the Court will view CUNY's 50(a) pre-verdict motion as questioning whether there was sufficient evidence to permit the jury to determine that Perdue's work during that time period was equal in skill, effort and responsibility to Kestenbaum and Reiner, and was performed under similar working conditions for, admittedly, less pay.[2]

Perdue provided extensive testimony regarding her responsibilities and duties as women's basketball coach and women's sports administrator. *See* Tr. 8/19/97 at 76–

---

**2.** The parties stipulated at trial to the salaries earned by Reiner, Kestenbaum and Perdue.

139. With regard to her responsibilities as coach, Perdue testified that sl. and the men's basketball team coach, Kestenbaum, coached "basically" the same season, the same number of games, the same number of players, and the same number of practices. *Id.* at 82. Perdue further testified that she and Kestenbaum were "both responsible [for] organizing and putting a team together that is going to become successful.... [R]ecruiting is a big responsibility of both positions." *Id.* at 83. Moreover, they both managed their team's budgets, scholarships, assistant coaches, scouting of opponents, game preparation, and ordering of equipment. *Id.* at 83–84. Perdue also testified that they both were responsible for the supervision, guidance, and counseling of athletes, and for team conduct. *Id.* at 85. Finally, Perdue and Kestenbaum were accountable to the same person. *Id.*

In deposition testimony of Kestenbaum read into the record by plaintiff, Kestenbaum testified that as men's basketball coach, he was "[p]rimarily responsible for coaching the team, getting them prepared for the season, preseason, and you know, preseason workouts, in-season practice and games, recruiting, dealing with other faculty, dealing with administration, media, the small amount of coverage we got, ... games, supervising my assistant coaches, trying to present a favorable image for Brooklyn College athletics to the public." Tr. 8/22/97 at 40. Kestenbaum also stated in his deposition testimony that he "would imagine" that Perdue performed these same duties. *Id.* at 40–41.

Contrary to CUNY's contention, the testimony was also sufficient to permit the jury to determine that Perdue performed the same duties as women's sports administrator as Reiner did as men's sports administrator during this time period. Descriptions of their respective sports administrator jobs, as Perdue pointed out, state that they "were both in charge of organizing, he with the men, the men's programs, me with the women." Tr. 8/19/97 at 136. In fact, according to the job descriptions, Perdue and Reiner

had the same eleven duties, and Perdue had the extra duty of "being available for guidance of all female student athletes." *Id.* at 137. Perdue and Reiner were both responsible for the daily operations of sports, game scheduling, organizing team budgets, organizing student orientation, and administering the athletic program. Plaintiff's Exh. 7A. In addition, Perdue and Reiner both reported to the same individual.

Linda Yost (Yost), Perdue's assistant coach at Brooklyn College, also testified with regard to Perdue's administrative duties, stating that Perdue's responsibilities included:

> Supervision of coaches. All facets of overseeing the women's programs. Budgeting. Scheduling. You know, the coaches went to her with specific problems as opposed to Len Roitman [Brooklyn College's Athletic Director]. She carried out the responsibilities as senior women's administrator, which incorporated all kinds of correspondence that come from the NCAA. There are meetings that have to be attended. There are letters that go out. I know she was on an administrative committee at one point with the NCAA in her capacity as a senior women's administrator.... Those were the things that I saw her do.

Tr. 8/21/97 at 46. Yost further testified that she was not aware of any change in Perdue's administrative responsibilities during this time period. *Id.* at 47.

Based upon all of this testimony, the jury could appropriately find that Perdue established all three elements of the EPA claim for the period from September 1, 1990 through July 9, 1992, namely that she performed equal work on jobs requiring equal skill, effort and responsibility as those performed by both Kestenbaum and Reiner, under similar working conditions, for less pay.[3] Thus, CUNY's 50(a) EPA motion, as well as that branch of its 50(b) motion challenging the jury's determination regarding the underlying elements of Perdue's EPA claim, are denied.

---

**3.** It is clear from the parties' stipulation as to the salaries earned during this time period, which was read to the jury, that Perdue earned less than the combined wages of Kestenbaum and Reiner.

### b. The Jury's Finding of Willfulness

■ The Court notes that CUNY failed to raise this ground in its Rule 50(a) motion and, accordingly, it is not preserved under Rule 50(b). In any event, the record provides ample evidence to support the jury's determination that CUNY's prohibited conduct was willful.

The Presidential Advisory Committee reviewed and approved salaries of athletic personnel. Tr. 8/21/97 at 107. Thus the jury could have appropriately concluded that CUNY was aware of the salary discrepancies between Perdue and her counterparts. Furthermore, Perdue testified that she complained to her superiors about her working conditions. For example, with regard to the fact that she was doing the laundry for the women's basketball team, Perdue explained: "I would go in and I would talk to my administrator, because he was the person that I felt was in charge of handling these issues: I would go in and tell him that, you know, everyone knew I was doing the laundry.... But I would go in and he would tell my athletic director about these issues." Tr. 8/19/97 at 106. Perdue also testified that she complained to her superiors about conflicts of practice time between the men's and women's basketball teams, *id.* at 108–09, the fact that she had to clean the gym before the women's basketball team's games, *id.* at 127–28, and the general disparities between the men's and women's basketball teams, Tr. 8/20/97 at 3–8. In addition, despite the fact that the Office of Civil Rights found that CUNY had committed multiple Title IX violations, there was testimony that CUNY did not implement the modifications promised in its detailed assurances. Tr. 8/19/97 at 161–64.

Finally, statements by other members of CUNY indicate that not only was CUNY aware of the disparities, but that CUNY was not willing to take steps to make improvements. For example, Perdue testified that when the Title IX subcommittee presented its report on Brooklyn College's women's sports at a meeting of the Presidential Advisory Committee, Len Roitman stated "let the women sue." Tr. 8/20/98 at 4–5.

This evidence is clearly sufficient to support the jury's finding that CUNY's violation was willful.

## C. Title VII Claim

### 1. Elements of a Title VII Intentional Discrimination Claim

Title VII provides that "[i]t shall be an unlawful employment practice for an employer ... to discharge any individual, or otherwise to discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's ... sex...." 42 U.S.C. § 2000e–2(a). In order to establish a claim of gender-based discrimination under Title VII. Perdue was required to prove that " 'she was treated less favorably than comparable male employees in circumstances from which a gender-based motive could be inferred.' " *Luciano v. Olsten Corp.*, 110 F.3d 210, 215 (2d Cir.1997) (quoting *Montana v. First Fed. Sav. and Loan Ass'n of Rochester*, 869 F.2d 100, 106 (2d Cir.1989)). A plaintiff need not prove discrimination through direct evidence, rather, "a plaintiff charging discrimination against an employer is usually constrained to rely on the cumulative weight of circumstantial evidence." *Id.* After a plaintiff has met her burden of proving a *prima facie* case of discrimination, the burden shifts to the defendant to put forth nondiscriminatory reasons which motivated its decisions with respect to the plaintiff. *Id.; see Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Once the defendant puts forth a nondiscriminatory reason, the plaintiff has the opportunity to "demonstrate that defendant's articulated reason for its decision is in fact a pretext for discrimination," and has the "ultimate burden of persuasion to demonstrate ... that the challenged employment decision was the result of intentional discrimination." *Luciano*, 110 F.3d at 215.

### 2. The Verdict and Supporting Evidence

■ The jury found that sex was a motivating factor for CUNY's actions with respect to Perdue's compensation, terms, con-

ditions, or privileges of employment.[4] CUNY failed to raise this issue in its 50(a) pre-verdict motion; thus, it is also unpreserved under Rule 50(b). In any event, contrary to CUNY's contention that Perdue "offered no evidence other than self-serving statements that she suffered discrimination in the terms and conditions of her employment," Memorandum of Law in Support of Defendant's Motion for a Judgment as a Matter of Law at 27, the record is replete with support for the jury's determination that CUNY intentionally discriminated against Perdue on the basis of her gender in violation of Title VII.

Initially, much of the evidence supportive of Perdue's successful EPA claim was also relevant to her Title VII intentional discrimination claim. In addition, Perdue's testimony, as well as the testimony of Yost, Linda Carpenter (Carpenter), Donna Lopiano (Lopiano), and Kestenbaum, illustrate the disparate treatment of Perdue as women's basketball coach as compared to the treatment of the men's basketball coach. Perdue testified that, although no one demanded that she do the laundry, Tr. 8/20/97 at 153, during the last two years of her employment at CUNY she "was washing uniforms with the manager from the men's team." Tr. 8/19/97 at 106. On the other hand, in deposition testimony read at trial, Kestenbaum testified that with regard to washing the men's uniforms, "When I took over, I refused to do that. I wouldn't do that and I got a manager who was able to do it." Tr. 8/22/98 at 51–52.

Kestenbaum also testified that as men's basketball coach, he had "two offices side by side." Tr. 8/22/97 at 43. In comparison, Lopiano, a witness for Perdue, testified that Perdue's office was "in what was the equivalent of a broom closet." Tr. 8/22/97 at 111. The conditions of Perdue's employment were also inferior with regard to her budget for housing, dining, recruiting, equipment, athletic undergarments, and uniforms. Tr. 8/19/97 at 92–133. Furthermore, Perdue, Carpenter, and Yost all testified that as coach of the women's basketball team, Per-

due had to clean the gym for her games, had worse game times and practice times, had fewer assistant coaches who worked only part-time as opposed to the full-time assistant coaches for the men's team, and had no team locker room. *Id.;* Tr. 8/21/97 at 107, 122–23 (Carpenter); Tr. 8/21/97 at 49–50, 53–55, 57, 60, 70 (Yost). For example, in comparing the locker rooms used by the men's basketball team with those used by the women's basketball team. Yost testified that "[t]he men's locker room, you know, it was carpeted, it has just a smaller bank of lockers that are larger in size that, you know, I mean it has chairs, not benches." Tr. 8/21/97 at 50, whereas the women used the general women's locker room which "has no privacy. People are coming and going. It is just a mass group of lockers and benches and whatever." *Id.*

Finally, the testimony discloses that Perdue was subjected to sexual slurs and improprieties. For example, Perdue testified that at lunch after she had run in a race, Reiner said "that he had noticed that I had run in the race, and he hadn't realized before that time that I was running the race, how large my breast [sic] were," and then a vote was taken regarding the size of her breasts. Tr. 8/19/97 at 167.

### 3. Compensatory Damages

The jury was instructed that it could award compensatory damages on Perdue's Title VII claims for pain and suffering and mental anguish. Furthermore, the Court instructed the jury that "[b]ack pay wages does not enter into your damage consideration." Tr. 8/28/97 at 35. The jury determined that Perdue sustained compensatory damages in the amount of $85,000 as a result of CUNY's intentional discrimination. In its Rule 50(b) motion, CUNY requests that the Court set aside the jury's compensatory damages award on the grounds that Perdue failed to present any evidence that she suffered pain or mental anguish and that the award was excessive.

---

**4.** The specific question posed to the jury was: Question 6: "Do you find that Perdue proved by a preponderance of the evidence that CUNY intentionally discriminated against her on the basis

of her sex; that is, was Perdue's sex a motivating factor in CUNY's actions with respect to Perdue's compensation, terms, conditions, or privileges of employment?"

There was sufficient evidence to support the jury's determination that CUNY's treatment of Perdue caused her pain and suffering and emotional distress. Perdue testified that she felt disgraced, embarrassed, scared, and concerned that her future and reputation would be ruined. Tr. 8/20/97 at 29–30, 34, 36, 43–44. When testifying about how she felt about the way that other individuals in her department spoke, Perdue stated that "I have never experienced this type of talk in a professional environment in athletics before, and not since. *** It made me feel belittled. It made me feel not equal. It made me feel disrespected. It made me feel that no matter what I did, it would not be valued." *Id.* at 36. Consequently, she experienced significant stress which aggravated a preexisting back condition, causing her to consult with a chiropractor and physician and to take pain killers. *Id.* at 37–38; *cf. Annis v. County of Westchester*, 136 F.3d 239, 249 (2d Cir.1998) (no allegation of any physical manifestation of emotional distress or evidence of concrete emotional problems).

A jury's verdict should be set aside where it is excessive, or in other words, where the award "shock[s] the judicial conscience and constitute[s] a denial of justice." *Lee v. Edwards*, 101 F.3d 805, 808 (2d Cir. 1996). Based upon a review of the record, as well as other jury awards in cases involving discriminatory employment practices, the Court concludes that the jury's award of compensatory damages does not shock the conscience. In determining the excessiveness of a jury's award, a court should examine awards in similar cases. *See Lee*, 101 F.3d at 805. The Second Circuit has commented in that regard:

> Appellant's brief collects a sizeable list of cases in which either judgment was entered on a smaller jury verdict or the district or appellate court ordered remittitur. We stress, however, that our task is not to balance the number of high and low awards and reject the verdict in the instant case if the number of lower awards is greater. Rather, we inquire whether the . . . verdict is within a reasonable range.

*Ismail v. Cohen*, 899 F.2d 183, 187 (2d Cir. 1990).

Courts have upheld comparable compensatory damage awards in related circumstances. *See Cornwell v. Robinson*, 23 F.3d 694 (2d Cir.1994) (affirming compensatory damages award of $175,000 on Title VII claim based on gender discrimination which adversely affected work conditions and created hostile work environment); *Wade v. Orange County Sheriff's Office*, 844 F.2d 951 (2d Cir.1988) (affirming jury's compensatory damage award of $50,000 for discrimination in employment on the basis of race); *see also Colwell*, 967 F.Supp. 1419 (upholding compensatory damage awards of $65,683 and $70,636 on ADA claims alleging denial of promotion); *Hurley v. Atlantic City Police Dep't*, 933 F.Supp. 396, 425 (D.N.J.1996) (reducing compensatory damage award of $575,-000 under New Jersey law against discrimination to $175,000, "tak[ing] some guidance from Title VII"); *Dailey v. Societe Generale*, 889 F.Supp. 108 (S.D.N.Y.1995) (affirming compensatory damages award of $100,000 on Title VII retaliation claim). Thus, it is clear that the jury's award of $85,000 in compensatory damages falls within a "reasonable range."

## II. CUNY'S MOTION FOR A NEW TRIAL

In the alternative to its motion for judgment as a matter of law, CUNY moves for a new trial pursuant to Federal Rule of Civil Procedure 59(a) on the EPA and Title VII liability issue, and for a new trial or a remittitur pursuant to Rule 59(e) on the compensatory damages award. Unlike a motion for judgment as a matter of law, there is no preservation requirement for a motion for a new trial. " 'A motion for a new trial ordinarily should not be granted unless the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice.' " *Atkins v. New York City*, 143 F.3d 100, 101 (2d Cir.1998) (quoting *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 911 (2d Cir.1997)); *see Song v. Ives Lab., Inc.*, 957 F.2d 1041, 1046 (2d Cir.1992). "Unlike a [judgment as a matter of law], a new trial may be granted even if there is substantial evidence to sup-

port the jury's verdict." *Song*, 957 F.2d at 1047. In considering a motion for a new trial, a trial court " 'is free to weigh the evidence [itself] and need not view it in the light most favorable to the verdict winner.' " *Id.* (quoting *Bevevino v. Saydjari*, 574 F.2d 676, 684 (2d Cir .1978)).

While CUNY seeks a new trial on both EPA and Title VII liability, CUNY specifically contends that with regard to the EPA, the jury found against the weight of the evidence that the wage differential was not based on a factor other than sex. However, as the Court has noted above, there was more than sufficient evidence for the jury to conclude that sex was a determinative factor in the wages CUNY paid to Perdue. Upon a review of the record, the verdict does not constitute a miscarriage of justice and is not seriously erroneous. Therefore, the Court denies CUNY's motion for a new trial in regard to its culpability. Furthermore, the Court has determined that the jury's compensatory damages award does not "shock the judicial conscience." Thus, the Court denies CUNY's motion for a new trial or a remittitur of the compensatory damages award.

## III. REMEDIAL ISSUES REGARDING THE EQUAL PAY ACT

In addition to the $85,000 compensatory damages award, Perdue seeks back wages in the amount of $140,200, consisting of: (1) $22,750 for the period from September 1, 1990 through December 31, 1990; (2) $72,844 for the period from January 1, 1991 through December 31, 1991; and (3) $44,786 for the period from January 1, 1992 through July 9, 1992. Perdue also seeks employer matching retirement benefits, which she does not characterize as "back wages," in the amount of $1,119 for 1990, $3,435 for 1991, and $1,657 for 1992, and summer camp wages for 1991 in the amount of $3,500. Furthermore, Perdue claims that the back wages of $140,200

should be doubled as liquidated damages as a result of the jury's finding of willfulness. Finally, Perdue seeks prejudgment interest.

In opposition to Perdue's application for damages, CUNY argues that the State's Eleventh Amendment immunity bars monetary recovery under the EPA. Alternatively, CUNY contends that: (1) Perdue's damages should be calculated with reference to Kestenbaum only; (2) Perdue is not entitled to summer camp wages; (3) Perdue is not entitled to liquidated damages; and (4) Perdue is not entitled to employer matching retirement benefits.

## A. Eleventh Amendment Immunity and the Equal Pay Act

The issue of Eleventh Amendment immunity was initially raised in this litigation *sua sponte* by Judge Gershon on July 9, 1997, when she requested both parties to brief the question of whether the Supreme Court's decision in *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996), bars suit under the EPA against the State. In denying CUNY's pre-trial motion to dismiss the EPA claim, she resolved this issue, without comment, against CUNY. During the trial, CUNY again raised the issue, stating "We believe that pursuant to *Seminole*, the Equal Pay Act does not abrogate [Eleventh] Amendment ... immunity." Tr. 8/28/97 at 15. In response, this Court stated:

> That has been ruled on by Judge Gershon, that you can proceed against the state on the equal pay [act] notwithstanding the [Eleventh] Amendment. *Seminole* has been construed in this case as permitting that. I agree with Judge Gershon's rulings as to the law[.][T]hat will go forward.... [T]hat issue is preserved.

*Id.*[5]

■■■■■ The Eleventh Amendment provides: "The Judicial power of the United

---

**5.** By agreeing with Judge Gershon, the Court did not have to consider the law of the case doctrine, which " 'posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case,' " *Pescatore v. Pan Am. World Airways, Inc.*, 97 F.3d 1, 7–8 (2d Cir .1996)

(quoting *DiLaura v. Power Auth. of the State of N.Y.*, 982 F.2d 73, 76 (2d Cir.1992)). In any event, "[a]pplication of the 'law of the case' doctrine is 'discretionary and does not limit a court's power to reconsider its own decisions prior to final judgment.' " *Sagendorf–Teal v. County of Rensselaer*, 100 F.3d 270, 277 (2d Cir.1996)

States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. The Eleventh Amendment bars suits for monetary damages by all persons against a State in Federal Court. *See Port Auth. Trans–Hudson Corp. v. Feeney,* 495 U.S. 299, 304, 110 S.Ct. 1868, 109 L.Ed.2d 264 (1990); *Mancuso v. New York State Thruway Auth.,* 86 F.3d 289, 292 (2d Cir.1996). This immunity also applies to entities, such as CUNY, which are considered to be governmental in nature or "arms of the state." *Komlosi v. New York State Office of Mental Retardation and Developmental Disabilities,* 64 F.3d 810, 815 (2d Cir.1995).

■■■■ Immunity under the Eleventh Amendment does not apply in two situations: (1) a State may consent to be sued in federal court; and (2) Congress may abrogate sovereign immunity. *See Feeney,* 495 U.S. at 304, 110 S.Ct. 1868. Since CUNY has not consented to be sued in federal court under the EPA, the Court must decide whether in enacting the EPA Congress has abrogated the States' sovereign immunity in respect to claims arising under that act. This determination is governed by application of the two-part test articulated by the Supreme Court in *Seminole Tribe:* "[F]irst, whether Congress has 'unequivocally expresse[d] its intent to abrogate the immunity' ... and second, whether Congress has acted 'pursuant to a valid exercise of power.'" 517 U.S. at 55, 116 S.Ct. 1114 (internal citation omitted).

The immunity issue in *Seminole* centered on the second part of the test since the statute in question, the Indian Gaming Regulatory Act, clearly authorized suits by Indian tribes against States. In addressing the issue of whether Congress had acted pursuant to a valid exercise of power, the Court noted that it had only found authority to abrogate under two provisions of the Constitution: (1) In *Fitzpatrick v. Bitzer,* 427 U.S. 445, 96

S.Ct. 2666, 49 L.Ed.2d 614 (1976), the Court held "that through the Fourteenth Amendment, federal power extended to intrude upon the province of the Eleventh Amendment," *Seminole,* 517 U.S. at 59, 116 S.Ct. 1114, and therefore that § 5 of the Fourteenth Amendment, which expressly provides that "[t]he Congress shall have the power to enforce, by appropriate legislation, the provisions of [the Amendment]," allowed Congress "to abrogate the immunity from suit guaranteed by the [Eleventh] Amendment." *Seminole,* 517 U.S. at 59, 116 S.Ct. 1114; and (2) In *Pennsylvania v. Union Gas Co.,* 491 U.S. 1, 109 S.Ct. 2273, 105 L.Ed.2d 1 (1989), a plurality of the Court found that Art. I, § 8, cl. 3 of the Interstate Commerce Clause granted Congress the power to abrogate state sovereign immunity in respect to legislation enacted thereunder, reasoning that "the power to regulate interstate commerce would be 'incomplete without the authority to render States liable in damages.'" 517 U.S. at 59, 116 S.Ct. 1114 (quoting *Union Gas,* 491 U.S. at 19–20, 109 S.Ct. 2273).

Petitioner in *Seminole* argued, and the Supreme Court agreed, that there was no principled distinction in favor of the States that could be drawn between the Indian Commerce Clause and the Interstate Commerce Clause. The Court concluded, however, that *Union Gas* was wrongly decided, expressly overruled it, and, therefore, rejected petitioner's contention that the Indian Commerce Clause abrogated the States' immunity from suit. Significantly, the Court left intact its holding in *Fitzpatrick,* commenting that "*Fitzpatrick* was based upon a rationale wholly inapplicable to the Interstate Commerce Clause, *viz.,* that the Fourteenth Amendment, adopted well after the adoption of the Eleventh Amendment and *the ratification of the Constitution,* operated to alter the pre-existing balance between state and federal power achieved by Article III and the Eleventh Amendment." 517 U.S. at 65–66, 116 S.Ct. 1114.

(quoting *DiLaura,* 982 F.2d at 76). "'The major grounds justifying reconsideration are an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.'" *DiLaura,* 982 F.2d at 76 (quoting *Virgin Atl. Airways v. National Mediation Bd.,* 956 F.2d 1245, 1255 (2d Cir.1992) (other quotations omitted)).

The Equal Pay Act, Pub.L. No. 88–38 (codified at 29 U.S.C. § 206(d)), was initially enacted by Congress in 1963 as an amendment to the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201–219, and was extended to the States in 1974. *See* Fair Labor Standards Amendments of 1974, Pub.L. No. 93–29, § 6. The Second Circuit recently was called upon in *Close v. State of New York*, 125 F.3d 31 (2d Cir.1997), to determine whether a suit can be maintained against the State for its failure to pay overtime compensation in violation of 29 U.S.C. § 207(a) of the FLSA. Applying the requisite two-prong test of *Seminole*, the court held, in regard to the first prong, that Congress clearly intended to abrogate the States' sovereign immunity in respect to the FLSA. *Close*, 125 F.3d at 36 ("The language of the FLSA evinces a clear intent to abrogate the States' sovereign immunity by allowing suit in federal courts."). However, in regard to the second prong of the *Seminole* inquiry, the Second Circuit, noting that the FLSA was enacted pursuant to Congress' power under the Interstate Commerce Clause, held on the strength of the Supreme Court's overruling of *Union Gas* in *Seminole*, that Congress could not, therefore, be deemed to have acted pursuant to a valid exercise of power in seeking to abrogate the States' sovereign immunity by enactment of the FLSA. Consequently, New York could not be sued for its alleged failure to pay overtime compensation.

Since the EPA is part of the FLSA, a broad reading of *Close* would bar suits bottomed on the EPA against the States. In this Court's opinion, however, it would be improper to do so. While neither the Second Circuit nor any district court within the circuit has yet to address the precise issue, the Court believes that the majority opinion of the one circuit court that has ruled on the issue has correctly reasoned that, notwithstanding its inclusion in the FLSA, the extension of the EPA to the States in 1974 implicitly reflected a valid exercise of Congress' power under § 5 of the Fourteenth Amendment. *Timmer v. Michigan Dep't of Commerce*, 104 F.3d 833 (6th Cir.1997). Essentially, the court in *Timmer* viewed the essence of the EPA's extension to the States—prohibiting the States from engaging in gender-based salary discrimination—to be more in keeping with the tenets of the Fourteenth Amendment than with the Commerce Clause. Thus, in distinguishing the EPA from that court's prior determination regarding the minimum wage provisions of the FLSA, the court concluded:

> We emphasize that this suit concerns a claim under the Equal Pay Act for discrimination based on sex. Although the Equal Pay Act and the minimum wage provisions of the FLSA are located in the same section, they are distinct provisions with different goals. The legislative history establishes that the Act was added to the FLSA primarily to utilize the existing administrative and enforcement machinery in the interest of efficiency. Moreover, the FLSA contains a broad severability clause. Therefore, it does not control our decision that this Court has held that the FLSA's minimum wage and maximum hour provisions are unconstitutional as applied to States.

*Id.* at 843.

Three of the four district courts that have addressed this issue have followed the Sixth Circuit's holding. *See Gehrt v. University of Illinois at Urbana–Champaign Coop. Extension Serv.*, 974 F.Supp. 1178, 1184 (C.D.Ill. 1997) (holding that Congress enacted the EPA pursuant to § 5 of the Fourteenth Amendment); *Ussery v. State of Louisiana*, 962 F.Supp. 922, 928–29 (W.D.La.1997) (same); *Varner v. Illinois State Univ.*, 986 F.Supp. 1107, 1112 (C.D.Ill.1996), *reconsideration denied*, 972 F.Supp. 458, 460 (C.D.Ill. 1997) (same); *but see Larry v. Board of Trustees of the Univ. of Alabama*, 975 F.Supp. 1447 (N.D.Ala.1997), *reconsideration granted and aff'd*, 996 F.Supp. 1366 (N.D.Ala.1998) (holding that Congress did not enact the EPA pursuant to § 5 of the Fourteenth Amendment and therefore lacked power to abrogate the States' immunity). The Court now adds to the growing list of precedent that has held the States accountable for violating the EPA, and believes that

the Second Circuit will qualify its holding in *Close* accordingly when presented with the issue.

## B. Calculation of Damages

■ The concept underlying the remedial scheme in employment discrimination cases is to make the plaintiff whole. *See Albemarle Paper Co. v. Moody,* 422 U.S. 405, 421, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975); *Colwell,* 967 F.Supp. at 1431 (citing *Landgraf v. USI Film Products,* 511 U.S. 244, 254, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994)). In employment discrimination cases, "district courts have broad discretion to fashion a wide range of remedies." *Colwell,* 967 F.Supp. at 1431 (citing *Padilla v. Metro-North Commuter R.R.,* 92 F.3d 117, 125 (2d Cir.1996)), *cert. denied,* —— U.S. ——, 117 S.Ct. 2453, 138 L.Ed.2d 211 (1997); *Sands v. Runyon,* 28 F.3d 1323, 1327 (2d Cir.1994); *Whittlesey v. Union Carbide Corp.,* 742 F.2d 724, 727–28 (2d Cir.1984); *Berkman v. City of New York,* 705 F.2d 584, 595 (2d Cir.1983); *Association Against Discrimination in Employment, Inc. v. City of Bridgeport,* 647 F.2d 256, 288 (2d Cir.1981)). In accordance with these principles, the Court will proceed to fashion a full remedy.

The EPA authorizes back pay as a remedy to compensate for unlawful disparate salaries. 29 U.S.C. § 216; *see Pollis,* 132 F.3d 115, 118. The regulations promulgated pursuant to the EPA state that, for purposes of this statute, wages "include[ ] all payments made to [or on behalf of] an employee as remuneration for employment. The term includes all forms of compensation irrespective of the time of payment . . . whether called wages, salary, profit sharing . . . or some other name. Fringe benefits are deemed to be remuneration for employment." 29 C.F.R. § 1620.10. They include "retirement benefits; . . . leave; and other such concepts." 29 C.F.R. § 1620.11.

### 1. *Back Wages*

■ As discussed above, Perdue's back wages for the period from September 1, 1990 to July 9, 1992, should be based upon the wages paid to both Kestenbaum and Reiner. The parties stipulated at trial that for the 1990–1991 academic year. Kestenbaum's salary was $40,000, Reiner's salary was $69,477, and Perdue's total salary was $42,881. Tr. 8/19/97 at 150–51. Thus, for the 1990–1991 academic year. Perdue was paid $66,596 less than the combined salaries of Kestenbaum and Reiner. For the 1991–1992 academic year, the parties stipulated that Kestenbaum's salary was $42,200, Reiner's salary was $70,110, and Perdue's total salary was $44,077.[6] *Id.* Therefore, for the 1991–1992 academic year, Perdue was paid $68,233 less than their combined salaries. Therefore, Perdue is entitled to an award of $134,829 in back wages.[7]

### 2. *Unpaid Employer Matching Retirement Benefits*

Perdue contends that she is also entitled to damages equal to ten percent of the difference between her higher education officer (HEO) salary and Reiner's HEO salary as the maximum allowable amount payable to CUNY's retirement plan. Retirement benefits are properly included in calculating damages owed to an individual who has been discriminated against in violation of the EPA. *See* 29 C.F.R. §§ 1620.10–1620.11. CUNY does not contest that Perdue is entitled to an award of unpaid employer matching retirement benefits or that such an award should be based upon ten percent of the difference between Perdue's and Reiner's salaries. *See* CUNY's Letter Memorandum in Response To Court's Order of April 24, 1998. To determine the amount of retirement benefits owed to Perdue, the Court will subtract Perdue's total salary from the salary paid to Reiner during the period from 1990 to 1992

---

**6.** In respect to Perdue, Reiner and Kestenbaum, the 1991–1992 academic year ended on July 9, 1992, following the retrenchment of Brooklyn College's athletic program.

**7.** Perdue has requested in her post-verdict papers $140,200 in accordance with her trial testimony. However, the Court will hold the parties to their stipulation.

and multiply the difference by ten percent. Perdue was paid $26,596 less than Reiner for the 1990–1991 school year and $26,033 less than Reiner for the 1991–1992 school year. Perdue is entitled to $5,262 in unpaid retirement benefits.

### 3. Summer Camp Wages

Perdue contends that she is entitled to recover an additional $3,500, representing the salary Reiner earned during 1991 working at a summer camp. Perdue claims that she was unable to work at a summer camp during that year because she ran a women's basketball camp for CUNY during that summer for which she was paid a nominal amount. However, the record indicates that Perdue volunteered for the women's basketball camp. See Tr. 8/26/97 at 46–47; Tr. 8/21/97 at 7. Accordingly, she should not receive this additional sum.

### 4. Liquidated Damages

Since a plaintiff is entitled to liquidated damages in an amount equal to back wages where there is a willful violation of the EPA, see 29 U.S.C. §§ 216(b), 260, in light of the jury's finding of willfulness, Perdue is entitled to an additional $134,829 as liquidated damages.[8]

### 5. Prejudgment Interest

To make Perdue whole, the Court will award prejudgment interest on the back wages award of $134,829, the unpaid retirement benefits award of $5,262, and the jury's compensatory damages award of $85,000. See Saulpaugh v. Monroe Community Hosp., 4 F.3d 134, 144 (2d Cir.1993); Colwell, 967 F.Supp. at 1436; Luciano v. Olsten Corp. 912 F.Supp. 663, 676 (E.D.N.Y.1996). "[I]t is within the trial court's broad discretion to elect whether and how to compute prejudg-

ment interest." Greenway v. Buffalo Hilton Hotel, 143 F.3d 47, 55 (2d Cir.1998); see Luciano, 912 F.Supp. at 676. In accordance with other district courts in this circuit, the Court calculates prejudgment interest based on the United States 52–week treasury bill rate referred to in 28 U.S.C. § 1961. See Colwell, 967 F.Supp. at 1436; Luciano, 912 F.Supp. at 676–77. The Court calculates the average 52–week treasury bill rate to be 5.12% for the period September 1990 through May 1998. In calculating prejudgment interest, other courts in this Circuit have allocated the damages award evenly over the relevant time period. See, e.g., Luciano, 912 F.Supp. at 677 ("In the Court's view, the fair and logical approach to calculating the damages is to allocate the $150,714.00 back pay award evenly over the back pay period"); McIntosh v. Irving Trust Co., 873 F.Supp. 872, 874 (S.D.N.Y.1995) ("The objective of fully compensating the plaintiff is best effectuated by dividing the jury's back pay award evenly over the relevant time period for the purposes of calculating prejudgment interest.") The Court adopts this approach. Its application in this case is best achieved by basing the allocation over the twenty-three month period covered by the discriminatory conduct. Thus, the Court will allocate 4/23 of the award to the period from September through December 1990 for a total of $39,146.25, 12/23 to the period of January through December 1991 for a total of $117,438.80, and 7/23 to the period of January through July 1992, for a total of $68,505.95. The interest will be compounded annually. See Luciano, 912 F.Supp. at 677. The total compounded prejudgment interest, as set out in the tables that follow, is $83,264.94 as of May 31, 1998. Perdue is further entitled to per diem interest in the amount of $43.25 per day up to the date that judgment is entered.[9] See, e.g. Luciano, 912 F.Supp. at 677.

---

8. The Court need not determine whether the retirement benefits of $5,262 should be considered as part of "back wages" for purposes of liquidated damages since Perdue has limited her liquidated damages claim only to the lost salary.

9. The per diem rate is calculated by adding the prejudgment interest to the back wages, compensatory damages, and retirement benefits that have been awarded, which equals $308,355.94. At 5.12%, interest accrues on this amount at the rate of $43.25 per day.

Table 1: Interest on Damages Award of $39,146.25 at 5.12% Interest Rate for 1990

| Time Period | Interest | Compounded Annually |
|---|---|---|
| 1/91–12/91 | $2,004.29 | $41,150.54 |
| 1/92–12/92 | $2,106.91 | $43,257.45 |
| 1/93–12/93 | $2,214.78 | $45,472.23 |
| 1/94–12/94 | $2,328.18 | $47,800.41 |
| 1/95–12/95 | $2,447.38 | $50,247.79 |
| 1/96–12/96 | $2,572.69 | $52,820.48 |
| 1/97–12/97 | $2,704.41 | $55,524.89 |
| 1/98–5/98 | $1,184.53 | $56,709.42 |
| TOTAL INTEREST | $17,563.17 | -------- |

Table 2: Interest on Damages Award of $117,438.80 at 5.12% Interest Rate for 1991

| Time Period | Interest | Compounded Annually |
|---|---|---|
| 1/92–12/92 | $6,012.87 | $123,451.67 |
| 1/93–12/93 | $6,320.73 | $129,772.40 |
| 1/94–12/94 | $6,644.35 | $136,416.75 |
| 1/95–12/95 | $6,984.54 | $143,340.29 |
| 1/96–12/96 | $7,342.15 | $150,682.44 |
| 1/97–12/97 | $7,714.94 | $158,397.38 |
| 1/98–5/98 | $3,379.15 | $161,776.53 |
| TOTAL INTEREST | $44,398.73 | -------- |

Table 3: Interest on Damages Award of $68,505.95 at 5.12% Interest Rate for 1992

| Time Period | Interest | Compounded Annually |
|---|---|---|
| 1/93–12/93 | $3,507.05 | $72,013.00 |
| 1/94–12/94 | $3,687.07 | $75,700.07 |
| 1/95–12/95 | $3,875.84 | $79,575.91 |
| 1/96–12/96 | $4,074.29 | $83,650.20 |
| 1/97–12/97 | $4,282.89 | $87,933.09 |
| 1/98–5/98 | $1,875.90 | $89,808.99 |
| TOTAL INTEREST | $21,303.04 | -------- |

## IV. ATTORNEY'S FEES AND EXPENSES

Finally, Perdue has moved for attorneys' fees and expenses pursuant to 42 U.S.C. § 2000e–5(k) and 29 U.S.C. § 216(b) on be- half of her former counsel, MM, and her current counsel, FFC. Perdue seeks attorneys' fees in the amount of $268,333.75 and expenses in the amount of $10,725.27 for MM, and attorneys' fees in the amount of $385,662.75 and expenses in the amount of $7,324.70 for FFC.

CUNY objects to Perdue's fee application on the grounds that: (1) Perdue had only limited success; thus, the full amount requested by Perdue is not justified; (2) the hourly rates sought are excessive and unsubstantiated; (3) the number of hours billed is excessive and unsubstantiated; (4) Perdue's attorneys did not provide adequate details of the time, nature and costs of certain services performed; (5) certain activities should be compensated at a non-attorney level; and (6) Perdue has failed to establish the necessity of the expenses she is seeking.

### A. Applicable Law

Pursuant to 42 U.S.C. § 2000–5(k), a prevailing plaintiff in a Title VII action may collect "a reasonable attorney's fee ... as part of the costs." The EPA has a similar attorneys' fees provision, which provides that "the court ... shall, in addition to any judgment awarded to the plaintiff ..., allow a reasonable attorney's fee to be paid by the defendant, and costs of the action." 29 U.S.C. § 216(b). "The district court is afforded broad discretion in assessing a reasonable fee award based on the circumstances of the case." *Greenbaum v. Svenska Handelsbanken, N.Y.*, 998 F.Supp. 301, 303 (S.D.N.Y.1998) (citing *Hensley v. Eckerhart*, 461 U.S. 424, 437, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983)); *see Quaratino v. Tiffany & Co.*, 129 F.3d 702, 705 (2d Cir.1997).

The Supreme Court has adopted the lodestar method to determine a reasonable attorneys' fee, whereby the appropriate amount is calculated by multiplying a reasonable hourly rate by the number of hours reasonably expended by each attorney. *See Hensley*, 461 U.S. at 437, 103 S.Ct. 1933; *see also Quaratino*, 129 F.3d at 705. "In determining the number of hours reasonably expended for purposes of calculating the lodestar, the district court should exclude excessive, redundant or otherwise unneces-

sary hours, as well as hours dedicated to severable unsuccessful claims." *Id.* Finally, the lodestar amount may be modified based upon "considerations that may lead the district court to adjust the fee award upward or downward, including the important factor of the 'results obtained.'" *Hensley,* 461 U.S. at 434, 103 S.Ct. 1933; *see Quaratino,* 129 F.3d at 705.

The Court notes that the Second Circuit has granted *en banc* review of *Quaratino* on the issue of whether a district court judge has the option, as an alternative to the lodestar approach, of basing fee awards on a "billing judgment" standard. However, even if the Second Circuit were to determine that district courts have such discretion, this Court would here opt to employ the sanctioned lodestar methodology. Thus, the Court does not believe it necessary to defer its decision pending the *en banc* disposition of *Quaratino.*[10]

## B. Determination of Attorneys' Fees

Perdue seeks $653,996.50 in attorneys' fees, which includes a 25% enhancement of the MM fees and a 10% enhancement of the FFC fees because of the delay in payment of fees as a result of the length of the proceedings. Specifically, with regard to her former counsel, MM, Perdue requests compensation for: 149.0 hours for Jennifer Freeman (while a senior member at MM) at $285 per hour; 155.3 hours for Freeman (while a senior member at MM) at $295 per hour; 134.4 hours for Robert Lanza (a junior member at MM) at $225 per hour; 205 .4 hours for Linda Jamieson (of MM) at $175 per hour; 197.7 hours for Stephanie Fields (of MM) at $175 per hour; 129.8 hours for Paula Hopping (of MM) at $125 per hour; 33.4 hours

for Robert Novick (of MM) at $90 per hour; and 75.0 hours for Michele McCarthy (of MM) at $85 per hour. Affirmation of Jennifer Freeman in Support of Plaintiff's Motion for Fees and Expenses at 3.[11] With regard to her current counsel, FFC, Perdue requests compensation for: 684.1 hours for lead counsel Freeman (partner at FFC) at $295 per hour; 311.4 hours for Sara Chenetz (partner at FFC) at $295 per hour; 101.1 hours for Neil Forrest (partner at FFC) at $295 per hour; 140.0 hours for James Carroll (of FFC) at $175 per hour; and 32.0 hours for Maudlyn Lindner (of FFC) at $75 per hour. *Id.*[12]

### 1. Billing Rates

CUNY challenges the reasonableness of the rates charged by Perdue's counsel. A reasonable rate is one "in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Blum v. Stenson,* 465 U.S. 886, 895 n. 11, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984). "It is well-established that the 'prevailing community' the ... court should consider to determine the 'lodestar' figure is the 'district in which the court sits.'" *Luciano v. Olsten Corp.,* 109 F.3d 111, 115 (2d Cir.1997) (quoting *Polk v. New York State Dep't of Correctional Servs.,* 722 F.2d 23, 25 (2d Cir.1983)). Perdue has cited numerous cases to support the hourly rates requested. She has also submitted affidavits from local attorneys affirming that the proposed rates are not uncommon in the Eastern District.

The Court finds that the requested hourly rates for Freeman, Chenetz, and Forrest, all partners during the course of this litigation, are excessive. Although all three

---

**10.** The Court has reviewed the *en banc* briefs in *Quaratino* to assure itself that the right to use the lodestar formula was not in issue.

**11.** Perdue originally requested 200.6 hours for Fields and 206.3 hours for Jamieson. However, Perdue consented to a fifty percent reduction for any billed travel time. Fields billed 5.8 hours of travel time and Jamieson billed 1.8 hours of travel time, and the Court reduces Perdue's request accordingly. Plaintiff's Memorandum of Law in Reply to Defendant's Opposition to Plaintiff's Application for Damages and Attorneys'

Fees and Costs at 21, 22 n. 5 ("Plaintiff's Attorneys' Fees Reply").

**12.** Perdue originally requested 685.3 hours for Freeman, 312.4 hours for Chenetz, and 147.5 hours for Carroll. Freeman billed 1.2 hours of travel time, Chenetz billed 2 hours of travel time, and Carroll billed 15 hours of travel time. Pursuant to Perdue's consent to a reduction for any billed travel time, the Court reduces Perdue's request accordingly. Plaintiff's Attorneys' Fees Reply at 21, 22 n. 5.

have performed admirably and at the highest professional and ethical level, the hourly rates awarded by courts in this district during the past few years have ranged from $200 to $225 for partners. The Court determines that the appropriate hourly rates for these attorneys, considering, *inter alia*, that they have never before handled an employment discrimination case of this magnitude, are as follows: for Freeman, $215 for her initial period at MM and $225 for the remainder of her time at MM and her time at FFC, and for Chenetz and Forrest, $200. *See, e.g., Luciano*, 109 F.3d at 115–116 (affirming determination of district court for the Eastern District of New York that prevailing rate for partners is $200 and district court's award of $225 per hour for partner); *Foster v. Kings Park Cent. Sch. Dist.*, 174 F.R.D. 19, 27 (E.D.N.Y.1997) ($200 to $225 for partners); *Bourgal v. Atlas Transit Mix Corp.*, 1996 WL 75290 (E.D.N.Y. Feb.7, 1996) ($200); *New York State Assoc. of Realtors, Inc. v. Shaffer*, 898 F.Supp. 128 (E.D.N.Y.1995) ($200); *DeVito v. Hempstead China Shop, Inc.*, 831 F.Supp. 1037 (E.D.N.Y.1993) ($200); *Cruz v. Local Union No. 3*, 150 F.R.D. 29 (E.D.N.Y.1993) ($200), *aff'd in rel. part*, 34 F.3d 1148 (2d Cir.1994); *Nu–Life Constr. Corp. v. Board of Educ. of the City of New York*, 795 F.Supp. 602 (E.D.N.Y.1992), *aff'd in rel. part*, 28 F.3d 1335, 1342 (2d Cir.1994) ($200). Freeman is awarded a slightly higher hourly rate than Chenetz and Forrest because Freeman was lead attorney for Perdue throughout the proceedings. *See, e.g., Greenbaum*, 998 F.Supp. at 304.

█ In addition, the Court finds that the requested hourly rates for associates, ranging from $90 to $225 are excessive when compared with other fee awards in this district, which range from $100 for junior associates to $200 for senior associates. Here, the experience of the associates varied, ranging from one in private practice since 1987 to one in private practice since 1994, and none of them have had previous experience with an employment discrimination trial of this magnitude. The Court therefore adjusts the hourly rates as follows: Lanza's rate is $175, Jamieson, Fields, and Carroll's rates are $135, and Hopping's rate is $100. The rates requested for Novick is reasonable and will

not be adjusted. *See, e.g., Luciano*, 109 F.3d at 114 ($135 for associates); *Foster*, 174 F.R.D. at 27 ($135); *DeVito*, 831 F.Supp. at 1044 ($125 to $150); *Cruz*, 150 F.R.D. at 34 ($150 to $200); *Nu–Life Constr. Corp.*, 795 F.Supp. at 606 ($100 to $200). Finally, the court awards $75 per hour for the work performed by paralegals, thus reducing the request of $85 for McCarthy. *See, e.g., Luciano*, 109 F.3d at 114 ($50 per hour for paralegals); *Nu–Life Constr.*, 795 F.Supp. at 606($75).

█ CUNY also requests that the Court set a lower hourly rate for out-of-court attorneys' services as compared to in-court services and for clerical tasks performed by attorneys. In adjusting the lodestar figure, "a different rate of compensation may well be set for different types of litigation tasks." *Cohen v. West Haven Bd. of Police Commissioners*, 638 F.2d 496, 505 (2d Cir.1980). However, in this case the Court finds that the out-of-court services provided by Perdue's counsel, including legal research, writing, trial preparation, and conferences and telephone communications between attorneys, parties and witnesses, were no less valuable than the in-court services. Thus, the Court concludes that, with the exception of the adjustment of the billed travel time to which Perdue has consented, a further adjustment is not warranted.

### 2. Hours Billed

█ Once hourly rates are determined, the Court must determine whether the number of hours expended were reasonable. CUNY raises several objections to the hours submitted by Perdue. First, CUNY contends that Perdue failed to supply adequate records and descriptions of the hours billed. "Counsel is not required to 'record in great detail how each minute of his time was expended. But at least counsel should identify the general subject matter of [her] time expenditures.'" *Helbrans v. Coombe*, 890 F.Supp. 227, 234 (S.D.N.Y.1995) (quoting *Hensley*, 461 U.S. at 437 n. 12, 103 S.Ct. 1933). The Court has reviewed Perdue's time records and concludes that they "provide a sufficient basis for determining the

nature ... of work" performed by her attorneys. *Id.; see New York State Ass'n for Retarded Children, Inc. v. Carey,* 711 F.2d 1136 (2d Cir.1983).

Second, CUNY contends that the hours billed are excessive, redundant, and unnecessary and should be reduced by 75%. Specifically, CUNY claims that Perdue's attorneys billed hours for time spent on issues that were irrelevant to the case, including: (1) two different versions of a performance evaluation submitted to the EEOC on which Perdue's attorney's spent approximately 75 hours; (2) the attendance of CUNY's counsel at a meeting of Perdue, other Brooklyn College faculty members, and the Office of Civil Rights; (3) the retrenchment of Brooklyn College's Athletics Department; and (4) Perdue's medical claims. In addition, CUNY claims that hours were billed for research on well-settled law, such as the applicability of the New York State Human Rights Law to State entities, and for reading documents for the attorneys' general education in employment law. Furthermore, CUNY contends that some of the hours are redundant because several attorneys researched the same issues and that the case was overstaffed. Finally, CUNY contends that Perdue's attorneys spent unnecessary time speaking with experts who were not retained or called as witnesses.

■■■■■ The Court rejects CUNY's contention in respect to the time spent on the alleged irrelevant issues and conversations with experts. Although Perdue did not succeed on certain issues, the hours spent on these particular issues were not unreasonable. *See Grant v. Martinez,* 973 F.2d 96, 99 (2d Cir.1992). Similarly, although Perdue did not ultimately retain the experts with whom her attorneys spoke, it was reasonable for her attorneys to contact these individuals to determine whether their testimony would be beneficial. Furthermore, it was reasonable for Perdue's attorneys to review current employment law cases and law journal articles because of the rapidly developing law in this area, including the issue of whether Title IX provides for a private right of action, the applicability of *Seminole Tribe* to claims aris-

ing under the EPA, and the retroactivity of the Civil Rights Act of 1991.

■■■■■ However, the Court concludes that there was some redundancy and overlap. Although CUNY has made general, rather than specific, objections to hours billed by various attorneys as redundant and overlapping, upon a review of the contemporaneous billing records for each of the three partners and six associates who worked on the case, the Court agrees that a limited across-the-board reduction is indicated. *See, e.g., Luciano,* 109 F.3d at 117 (approving of 15% across the board reduction in hours because of excessive hours expended on contentious conduct between lead attorneys); *New York State Ass'n for Retarded Children,* 711 F.2d at 1146 (20% reduction for excessiveness and redundancy of hours). In addition, Perdue's attorneys have requested hours billed for general education in employment discrimination law. Although Perdue's attorneys are entitled to reasonable compensation for time spent in researching employment discrimination law, they should not be fully compensated for their general education. *See, e.g., Jennette v. City of New York,* 800 F.Supp. 1165, 1170 (S.D.N.Y.1992) (50% reduction for time expended reviewing basic civil rights cases). To account for both the redundancy in billed hours and the hours billed for general education in employment discrimination law, the Court will reduce the final lodestar calculation by 20%.

### 3. Perdue's Success on Her Claims

■■■■■ CUNY also request that the Court reduce Perdue's fee request by 75% because of her limited success on the merits. First, CUNY contends that Perdue failed to prevail on claims unrelated to her EPA and Title VII intentional discrimination claims. Specifically, Perdue did not prevail on her Title VII hostile work environment claim and her Title IX claims. However, where the unsuccessful and successful claims are " 'inextricably intertwined and involve a common core of facts or are based on related legal theories,' " fees may be awarded on the unsuccessful claims. *Quaratino,* 129 F.3d at 705 (quoting *Reed v. A.W. Lawrence & Co.,* 95 F.3d 1170, 1183 (2d Cir.1996) (internal

quotation omitted)); *see also Murphy v. Lynn,* 118 F.3d 938, 951 (2d Cir.1997) ("[a] plaintiff's lack of success on some of [her] claims does not require the court to reduce the lodestar amount where the successful and the unsuccessful claims were interrelated and required essentially the same proof"). Perdue's successful EPA and Title VII intentional discrimination claims were "sufficiently related to [her unsuccessful claims] that the amount of time expended on the successful claim[s] would not have been substantially less if th[ose] claim[s were] the only one[s] alleged." *Quaratino,* 129 F.3d at 709. Therefore, even though Perdue did not prevail on all of her claims, the Court declines to deduct a percentage of the lodestar amount.

Second, CUNY argues that Perdue had only limited success because she did not receive the amount of damages that she sought. The Court does not agree with CUNY's characterization of Perdue's success as "limited." Rather, the jury awarded Perdue $85,000 in compensatory damages, and the Court has awarded her $274,920 in back pay, retirement benefits, and liquidated damages. Thus, a reduction of the lodestar amount on this basis is not warranted.

### 4. Calculation of the Lodestar Amount

Based upon the pervious analysis, the lodestar is calculated as set forth in the following table:

| Attorney | Firm | Hours | Req. Rate[13] | Requested Subtotal | Adj. Rate[14] | Adjusted Subtotal | Total (with 20% reduction) |
|---|---|---|---|---|---|---|---|
| Freeman | MM | 149.0 | $285 | $42,465.00 | $215 | $32,035.00 | $25,628.00 |
| Freeman | MM | 155.3 | $295 | $45,813.50 | $225 | $34,942.50 | $27,954.00 |
| Lanza | MM | 134.4 | $225 | $30,240.00 | $175 | $23,520.00 | $18,816.00 |
| Jamieson | MM | 205.4 | $175 | $35,945.00 | $135 | $27,729.00 | $22,183.20 |
| Fields | MM | 197.7 | $175 | $34,597.00 | $135 | $26,689.50 | $21,351.60 |
| Hopping | MM | 129.8 | $125 | $16,225.00 | $100 | $12,980.00 | $10,384.00 |
| Novick | MM | 33.4 | $90 | $3,006.00 | $90 | $3,006.00 | $2,404.80 |
| McCarthy | MM | 75.0 | $85 | $6,375.00 | $75 | $5,625.00 | $4,500.00 |
| Freeman | FFC | 684.1 | $295 | $201,809.50 | $225 | $153,922.50 | $123,138.00 |
| Chenetz | FFC | 311.4 | $295 | $91,863.00 | $200 | $62,280.00 | $49,824.00 |
| Forrest | FFC | 101.1 | $295 | $29,824.50 | $200 | $20,220.00 | $16,176.00 |
| Carroll | FFC | 140.0 | $175 | $24,500.00 | $135 | $18,900.00 | $15,120.00 |
| Lindner | FFC | 32.0 | $75 | $2,400.00 | $75 | $2,400.00 | $1,920.00 |
| MM TOTAL | — | 1080.00 | — | $214,667.00 | — | — | $133,221.60 |
| FFC TOTAL | — | 1268.60 | — | $350,397.00 | — | — | $206,178.00 |
| TOTAL FEES | — | 2348.60 | — | $565,064.00 | — | — | $339,399.60 |

The Court declines to award the requested across the board increases of 25% for MM and 10% for FFC. "Fee enhancement is awarded only in exceptional cases."

---

**13.** "Req. Rate" represents the hourly rate requested by Perdue.

**14.** "Adj. Rate" represents the hourly rate as adjusted by the Court.

*Greenbaum*, 998 F.Supp. at 306. Although there were some novel issues raised in this matter and Perdue's attorneys obviously worked diligently in preparing for trial and performed well. Perdue's attorneys are fully compensated by the Court's lodestar calculation. *See, e.g., Luciano*, 109 F.3d at 116 ("[T]he district court did not abuse its discretion in determining that the additional factors ... were subsumed within the lodestar calculation.") (citing *Blum*, 465 U.S. at 898–900, 104 S.Ct. 1541); *Greenbaum*, 998 F.Supp. at 306 ("It is the practice of courts in awarding attorneys' fees to subsume all factors into the lodestar calculation, which the Court has done in its lodestar calculation here.") (citing *Loper v. New York City Police Dep't*, 853 F.Supp. 716, 722 (S.D.N.Y.1994)). Thus, the Court awards Perdue a total of $339,399.60 in attorneys' fees—$133,221.60 for MM and $206,178.00 for FFC.

## C. Expenses

■ In addition to attorneys' fees, Perdue seeks $18,049.97 in expenses.[15] Perdue requests reimbursement of expenses for photocopying, courier services, telephone calls, faxes, legal research on LEXIS and Westlaw, postage, filing fees, Federal Express, and meals. CUNY objects to these expenses on the grounds that they are excessive and that some are improper. The Court agrees that certain itemized expenses are not recoverable. Absent evidence that the faxes were sent outside of metropolitan New York, the Court declines to award expenses for these faces and reduces the request by $516.25.

See, e.g., *Ginsberg*, 1998 WL 19997, at *4 (declining to award expenses for faxes). Furthermore, the Court declines to award miscellaneous meal expenses in the amount of $551.53. *See, e.g., Ginsberg*, 1998 WL 19997, at *4 (declining to award expenses for attorneys' meals). The remainder of the requested expenses are reasonable, and the Court awards Perdue $16,982.19 in expenses—$10,586.45 for MM and $6,395.74 for FFC.

## CONCLUSION

For the foregoing reasons, CUNY's motions for judgment as a matter of law, or alternatively for a new trial and/or a remittitur, are denied. Judgment shall be entered in favor of Perdue against CUNY and Brooklyn College, jointly and severally, in the total sum of $799,566.73, plus *per diem* interest at the rate of $43.25 from June 1, 1998, to the date of entry. This judgment represents the following:

1. Attorneys' fees in the amount of $133,221.60 and expenses in the amount of $10,586.45 for MM, and attorneys' fees in the amount of $206,178.00 and expenses in the amount of $6,395.74 for FFC.[16]

2. Damages of: (a) $134,829 in back wages; (b) $85,000 in compensatory damages; (c) $5,262 in unpaid retirement benefits; and (d) $134,829 in liquidated damages;

3. Prejudgment interest through May 31, 1998, in the amount of $83,264.94; and

---

**15.** Perdue originally requested $18,376.22 in expenses; however, in her Reply Memorandum of Law, she reduced this amount by $326.25 for secretarial overtime in December 1995 and May 1996.

**16.** Perdue requests that all expenses and 75% of the attorneys' fees award be paid immediately. As support for this request, Perdue cites 11 U.S.C. § 331 of the Bankruptcy Code, which "permits a trustee, an examiner, a debtor's attorney, or any professional person employed [pursuant to the code] to apply to the court for interim compensation and reimbursement for expenses for services rendered before the date of the fee

application." 3 Collier on Bankruptcy ¶ 331.01, at 331–3. The purpose of this provision is "to assure the continued efficient rendition of professional services to the estate, ... [o]therwise, bankruptcy attorneys may be forced to finance the administration of a case...." *Id., see In re Child World, Inc.*, 185 B.R. 14, 16–18 (Bankr. S.D.N.Y.1995); *In re Regan*, 135 B.R. 216, 217–18 (Bankr.E.D.N.Y.1992). There is, however, no comparable statutory provision regarding attorneys' fees in either the EPA or Title VII. Even if the issue were deemed to rest in the Court's sound discretion, the Court would not exercise such discretion in this case.

4. *Per diem* interest of $43.25 from June 1, 1998 to the date judgment is entered.

**SO ORDERED.**