XIAO–YUE GU, Plaintiff,

v.

HUGHES STX CORPORATION, Defendant.

No. CIV.A.AW–98–4069.

United States District Court, D. Maryland, Southern Division.

Feb. 1, 2001.

Jeffrey M. Bernbach of Bernbach Law Firm, New York, NY; Fred Allentoff of Bierer, Allentoff & Margolis, Baltimore, MD; and Lorin H. Bleecker, Cabin John, for Plaintiff.

Jeffrey P. Ayres and Robin Bruckmann Bowerfind of Venable, Baetjer & Howard, LLP, Baltimore, MD, for Defendant.

### MEMORANDUM OPINION

WILLIAMS, District Judge.

Currently pending before the Court are: (1) Plaintiff's Motion for Attorneys' Fees and Costs; (2) Plaintiff's Motion for Front Pay; and (3) Plaintiff's Supplemental Petition for Attorneys' Fees and Costs. This case stems from Plaintiff's Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623(d), claim in the context of a reduction-in-force (RIF). In a memorandum opinion dated May 10, 2000, this Court denied Hughes' motion for summary judgment. On July 24, 2000, Defendant tendered an Offer of Partial Summary Judgment. Dr. Gu accepted the offer of $150,000 for back pay and liquidated damages on August 3, 2000. That same day, Hughes offered Dr. Gu reinstatement to her former position. Dr. Gu rejected the offer. Consistent with the parties' agreement, this Court entered an order of partial summary judgment against Hughes on August 9, 2000. By agreement of the parties, the entry of partial summary judgment excluded the issue of Plaintiff's enti-

tlement to front pay and attorneys' fees and costs, leaving resolution of these issues to the Court.

Plaintiff is seeking an award of front pay in the amount of $1,126,775.90. Plaintiff's first petition requests $174, 767.85 in attorneys' fees and $5,227.22 in costs. Plaintiff's supplemental petition seeks an additional $23,800 in attorneys' fees and $4,193.80 in costs. The motions have been fully briefed by all parties. On January 5, 2001, the Court held a hearing on the pending motions. Upon consideration of the arguments made in support of, and opposition to, the respective motions, the Court makes the following determinations.

## I. *FACTUAL BACKGROUND*

The Plaintiff is Dr. Xiao–Yue Gu ("Dr. Gu"), who was a senior scientist employed by Defendant Hughes STX. Dr. Gu worked for Hughes STX from 1989 through October 1996, at one of the company facilities in Lanham, Maryland. During her tenure, Dr. Gu was employed primarily on what was known as the Ozone Project. The Ozone Project was a NASA-funded scientific project. From 1995 to 1997, NASA decided to substantially decrease its funding in the Ozone Project. NASA specifically indicated that they would require a reduction-in-force in the Ozone Project, and directed Hughes STX to reduce the employee headcount by one out of the 12–13 scientists who worked at any given time in the Ozone Project. Dr. Gu was the selected employee. After it was determined that no comparable position within the company was available, Dr. Gu was terminated in October 1996. After one year of searching for another research post, she took two academic positions at two colleges in Massachusetts. On December 14, 1998, Dr. Gu filed her suit for age discrimination.

## II. *DISCUSSION*

### A. *Offer of Reinstatement*

On the day Plaintiff accepted Defendant's offer of partial summary judgment, Defendant issued Plaintiff an offer of reinstatement to her "prior job." Plaintiff attacks the genuineness of Defendant's offer of reinstatement on several fronts. She maintains that her rejection of Defendant's recent offer of reinstatement was reasonable because the offer was not made in good faith. In particular, she characterized the offer as untimely in that it was made four years after her discharge and two years after the filing of her suit. According to Plaintiff, the offer to return to her "prior job" lacked sufficient specifics as to the capacity to which she would be returned. Plaintiff also questions the ability of Defendant to pay as the company has consistently maintained that it has suffered severe funding cuts from NASA. Lastly, she argues that reinstatement is impracticable under the circumstances.

Ordinarily, the receipt of a good faith offer for reinstatement to a comparable position ends the employer's liability for front pay. *Ford Motor Co. v. E.E.O.C.*, 458 U.S. 219, 102 S.Ct. 3057, 73 L.Ed.2d 721 (1982). Yet, refusal of reinstatement does not necessarily preclude the award of front pay if a plaintiff has reasonably refused the offer. *Smith v. World Ins. Co.*, 38 F.3d 1456, 1464 (8th Cir.1994). It is the duty of the trier of fact to determine whether a reasonable person would have refused the offer. *E.E.O.C. v. Prudential Federal Sav. & Loan Ass'n*, 763 F.2d 1166 (10th Cir.1985). The cornerstone is that the Plaintiff's rejection of the offer must be reasonable. For example, in *Smith*, the Tenth Circuit found that, under the totality of the circumstances, the plaintiff reasonably refused the defendant's offer of reinstatement where the offer came three years after his constructive discharge, poor performance evaluations would not be expunged from his employment record, and the individual responsible for his discriminatory discharge was still employed with the defendant. 38 F.3d at 1464. By contrast, in *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 908 (2d Cir.1997), the

Second Circuit found that the plaintiff had unreasonably rejected an offer of reinstatement on the same terms and conditions as his previous employment on the grounds that the plaintiff wanted a higher salary, made unsupported claims of bad faith, and had already accepted a new position with a new employer.

■ Here, Defendant's offer of reinstatement was made four years after Plaintiff's discharge and two years after she initiated suit. Given that Defendant had recruited Plaintiff's former supervisors to vilify her professional capabilities and its counsel made the offer of reinstatement almost immediately after Plaintiff accepted the offer of partial summary judgment with the understanding that this Court would rule on the appropriateness of future remedies, it was reasonable for Plaintiff to reject Defendant's offer of reinstatement. *See generally Eichler v. Riddell, Inc.*, 961 F.Supp. 211 (N.D.Ill.1997) (finding that plaintiff reasonably rejected offer of reinstatement given that her former employer had "gone overboard" in attacking her job performance and the suspicious timing of the employer's offer).

■ Equally important, the offer of reinstatement to Plaintiff's "prior job" engenders confusion as to the scope of her anticipated employment within the organization as the position described in the Defendant's opposing memorandum is not Plaintiff's "prior job." In addressing Plaintiff's complaints of vagueness in the offer, Defendant apparently counters that Plaintiff had a duty to inquire as to any specifics relating to the offer of reinstatement before rejecting it. The Court disagrees. An offer of reinstatement must be sufficiently specific for the plaintiff to be able to gauge whether the employment offered is comparable to the employee's previous job. *See Graefenhain v. Pabst Brewing Co.*, 870 F.2d 1198, 1204 (7th Cir.1989). Thus, the employer bears the burden of proof regarding the offer's adequacy. *Id.* In *Graefenhain*, the Seventh

Circuit described the employer's offer as follows:

> The offer consisted entirely of the following statement by Pabst's attorney: '[T]he Pabst Brewing Company would be willing to reinstate Mr. Miller ... We would like to make very clear ... that there is no hostility from our standpoint toward either of these two Plaintiffs. Mr. Lyons, the gentleman with whom Mr. Miller had considerable difficulties, is no longer with the company, of course. I have with me today Mr. John Culhain, who is the General Counsel and Officer of Pabst and who has authorized us to make that offer of reinstatement to [Mr. Miller].'

870 F.2d at 1203–04. With this language before it, the court stated

> [d]espite Pabst's contention that its 'unconditional' offer of reinstatement terminated its front pay liability, this offer hardly guarantees Miller a position substantially comparable to his previous job. Pabst's offer was 'unconditional' only in the sense that it specified none of the conditions under which Miller would be reemployed; the district court could not conclude, based on this statement, that Miller had refused "comparable" or "suitable" employment.

*Id.* at 1204. By comparison, in *Giandonato v. Sybron Corp.*, 804 F.2d 120, 124–25 (10th Cir.1986), the court found the plaintiff unreasonably rejected an offer as having "too many uncertainties." In that case, the Tenth Circuit emphasized that the offer not only "would have reinstated [the plaintiff] to his former position on comparable terms," but also included terms to: "(1) fully reinstate [the plaintiff] with no loss of service ..., and no reduction in salary; (2) hire a new district manager so that [the plaintiff] would not have to report to [his former supervisor]; (3) not change future territory, accounts, and sales quotas except by written agreement between [the plaintiff] and his manager; and (4) stipulate that [the plaintiff] would not have to repay any of the severance pay

he had received." *Id.* at 124–25. The employer also repeatedly communicated the offer to the employee on five separate occasions, three times in writing. *Id.* at 121, 125. "Given the specificity of the offer, it is hardly surprising that the Tenth Circuit held that the burden was on the employee to seek clarification of any remaining 'uncertainties'." *Graefenhain,* 870 F.2d at 1204.

In the instant case, Defendant's counsel presented the offer of reinstatement to Plaintiff in the following manner:

> [i]n accordance with *EEOC v. Ford Motor Co.,* ..., Defendant unconditionally offers Plaintiff her prior job with Defendant. This offer is made without any admission of liability or wrongdoing on the part of Defendant.

(Def.'s Opp'n to Mot. for Front Pay, Ex. B.2) The offer, as read, provides no details as to salary, placement, title, or the type of anticipated work. But, the offer does, rather recalcitrantly, refuse to acknowledge the Plaintiff was not the poorly skilled scientist it portrayed her as during the pendency of this litigation. Defendant now states that Plaintiff's proposed salary was $63,000 in another ozone group with a contract which will last for several years. There is no indication that this information or any other details of the proposed reinstatement were communicated to Plaintiff. It was the duty to the Defendant to adequately communicate the particulars of the job. Given that the proposed job offers a different salary in a different science group and Defendant's acknowledgment that the position did not become available until June 2000, the Court finds that the characterization of the proposed offer as Plaintiff's "prior job" was not even an accurate depiction of the intended employment. The Court believes that the vague, and potentially misleading, offer considered in conjunction with the suspicious circumstances of its tender sufficiently demonstrate that Plaintiff reasonably rejected Defendant's offer of reinstatement.

## B. *Potential for Reinstatement*

Plaintiff argues that the circumstances of her discharge have fostered an atmosphere of animosity, hostility, and distrust toward her at Hughes that makes reinstatement impracticable. Specifically, Plaintiff states that she will have to work with the same people responsible for the disparaging assessment of her performance as a scientist that served as Defendant's basis for discharging her. Plaintiff argues that the negative remarks as to her ability have permeated her former workplace damaging her relationships with former colleagues. According to Plaintiff, she has also suffered depression as a result of her discharge and inability to find comparable employment.

"Although reinstatement is usually the preferred remedy for an age discrimination plaintiff, when reinstatement is infeasible or inappropriate, front pay may be appropriate to make [the] plaintiff whole." *Gries v. Zimmer, Inc.,* 795 F.Supp. 1379, 1384 (W.D.N.C.1992). "Reinstatement is not appropriate where ... the evidence and testimony of the parties evince 'such extreme hostility that, as a practical matter, a productive and amicable working relationship would be impossible.'" *Ford v. Rigidply Rafters, Inc.,* 984 F.Supp. 386, 392 (D.Md.1997) (quoting *Duke v. Uniroyal, Inc.,* 928 F.2d 1413, 1423 (4th Cir. 1991)). "Reinstatement has also been found inappropriate when the litigation itself created such animosity between the parties that any potential employer-employee relationship was irreparably damaged; ... or when the particular business for which the plaintiff was qualified was no longer operating; or when there was no comparable position available." *Duke,* 928 F.2d at 1423.

▉ Although acknowledging in its brief that Plaintiff was a good employee whose performance had nothing to do with her termination, Defendant refuses to even recognize the performance evaluation used to support her discharge as negative. (Def.'s Opp. Mot. Front Pay at 14.) Ac-

cording to Hughes STX's EEOC Position Statement/Chart, Dr. Gu possessed only three of the fourteen enumerated skills sets, which was the least of any scientist in the group. Hughes claimed that Dr. Gu was terminated because she possessed the least "breadth of skills" for Hughes STX and that Dr. Gu's skills were not "current." Plaintiff's affidavit evidences significant despair in returning to a work environment where her colleagues and supervisors continue to hold her in such poor regard. Lingering animosity and tensions in a working environment, with relatively few employees and that requires close contact with supervisors, reasonably supports an award of front pay in lieu of reinstatement. *Cooper v. Asplundh Tree Expert Co.*, 836 F.2d 1544, 1553 (10th Cir.1988). In light of the need for positive relations with other scientists in this close scientific community and Defendant's apparent refusal to retract its prior negative remarks from her professional record, this Court seriously doubts that Plaintiff could have a productive relationship at Hughes.

Additionally, in order to return to Hughes, Plaintiff must relocate from Massachusetts to Maryland. Defendant argues that the general considerations of geography do not apply because Plaintiff traveled the same distance from her family in Massachusetts to work at Hughes before her discharge. The Court finds this argument unavailing in light of "[t]he long-settled rule in the labor area ... that a wrongfully discharged employee need not accept, in mitigation of damages, employment that is located an unreasonable distance from his home." *Spagnuolo v. Whirlpool Corp.*, 717 F.2d 114, 119 (4th Cir.1983). "[R]elocation, even for a temporary period, is likely to be particularly unwelcome to a victim of age discrimination, who is most likely to have substantial personal and business ties to his community." *Id.* After her unsuccessful search for comparable employment in Maryland,

Plaintiff moved her search to Massachusetts in order to mitigate her damages. Requiring her to again relocate back to Maryland in order to resume working for the employer whose discriminatory actions precipitated the need for her to leave in the first place would produce an inequitable result that the Court declines to order. After a consideration of the totality of the circumstances, the Court believes that the facts of this case make reinstatement a poor remedy to make Plaintiff whole. "When reinstatement is unavailable, the Court may consider an award of front pay." *Ford v. Rigidply Rafters, Inc.*, 984 F.Supp. 386, 392 (D.Md.1997).

### C. *Front Pay in Lieu of Reinstatement*

#### 1. *Preservation of Front Pay Claim*

First, Defendant maintains that Plaintiff abandoned her request for front pay in lieu of reinstatement in Paragraph 7 on pp.5–6 of the Pre–Trial Order approved on July 21, 2000. Defendant does not point to any specific language of disclaimer by Plaintiff. Rather, Defendant apparently maintains that Plaintiff's abandonment of reinstatement or other future equitable relief may be inferred from its absence in the Pre–Trial Order. Defendant cites two cases to support its position that, although Plaintiff properly requested reinstatement as a remedy in her complaint, she must reiterate that request in subsequent submissions in order to preserve her claim for front pay. First, in *Monroe v. Penn–Dixie Cement Corp.*, 335 F.Supp. 231, 232–235 (N.D.Ga.1971), the court held that the ADEA was not in effect at the time plaintiff's cause of action arose. Then, assuming that the ADEA did apply, the court surmised that front pay in lieu of reinstatement was not an available remedy to any ADEA plaintiff, as such relief was too speculative.[1]

---

**1.** In *Castle v. Sangamo Weston, Inc.*, 837 F.2d 1550, 1562 (11th Cir.1988), the Eleventh Circuit specifically rejected this view, stating

"prospective relief involves some risk of uncertainty, but that in itself does not preclude an award of such relief." *See also Roush v.*

■ In *Wehr v. Burroughs Corp.*, 619 F.2d 276, 283 (3d Cir.1980), after declining to consider whether front pay was even an appropriate remedy in ADEA cases[2], the court stated that, in order to establish entitlement to front pay in lieu of reinstatement, the plaintiff must request reinstatement. The plaintiff in *Wehr* not only "specifically disclaimed any desire for reinstatement," but also failed to request any future relief until to conclusion of the trial. *Id.* at 284 n. 18, 19. The case merely expresses the view of some courts that a plaintiff must make some request for reinstatement or other future relief in order to preserve a claim for front pay in lieu of reinstatement. *See Barbour v. Merrill*, 48 F.3d 1270, 1279 (D.C.Cir.1995) (finding that request for reinstatement in the post-trial motions was sufficient to properly place issue of front pay before the district court); *Downes v. Volkswagen of America, Inc.*, 41 F.3d 1132, 1142 (7th Cir.1994); *Maxfield v. Sinclair*, 766 F.2d 788 (3d Cir.1985) (stating that specific request for future damages in complaint preserves the issue of front pay). *But see Roush*, 10 F.3d at 398 ("We have never held that a plaintiff must request reinstatement as a prerequisite to recovering front pay ...."); *Williams v. Valentec Kisco, Inc.*, 964 F.2d 723, 730 (8th Cir.1992). Defendant does not dispute that Plaintiff adequately raised the issue of reinstatement or a request for future damages in her complaint. Nor does Defendant cite any specific language of relinquishment, but asks this Court to find abandonment by implication. The Court declines to do so and finds that Plaintiff did not abandon her right to reinstatement or, in the alternative, front pay.

### 2. *Appropriateness of Front Pay*

Plaintiff asserts several grounds to establish her entitlement to front pay. She

primarily argues that the Defendant's discriminatory discharge has effectively ended her career as a research scientist at Hughes and in the marketplace. She also contends that she has satisfied her duty to mitigate her damages. In assessing the appropriateness of an award of front pay, "courts have considered the plaintiff's prospects of obtaining comparable employment; the time period of the award; whether the plaintiff intended to work; and whether liquidated damages have been awarded." *Ford v. Rigidply Rafters, Inc.*, 984 F.Supp. 386, 392 (D.Md.1997). Courts have also considered how the plaintiff's health and age may affect her future prospects for employment. *See Lewis v. Federal Prison Industries, Inc.*, 953 F.2d 1277, 1280 (11th Cir.1992). "[W]hen the period for reinstatement was expected to be a relatively short one, such as if the plaintiff was close to retirement, the strong preference in favor of reinstatement has been found to be neutralized by the increased certainty of the potential loss of pay, permitting consideration of a front pay award." *Duke v. Uniroyal, Inc.*, 928 F.2d 1413, 1423 (4th Cir.1991). Here, Plaintiff's unsuccessful search to gain comparable employment over the past four years indicates that her age of 55 and the circumstances surrounding her dismissal may have limited her prospects of attaining employment substantially equivalent to her former position.

■ Defendant attacks Plaintiff's claim for front pay on the basis that she failed to mitigate her damages by seeking other comparable employment. "[T]he duty to mitigate damages requires that the claimant be reasonably diligent in seeking and accepting new employment substantially equivalent to that from which [s]he was discharged." *Brady v. Thurston Motor Lines, Inc.*, 753 F.2d 1269, 1273 (4th Cir.1985). "For a ... claimant to fulfill

---

*KFC Nat'l Management*, 10 F.3d 392, 398 (6th Cir.1993); *Whittlesey v. Union Carbide Corp.*, 742 F.2d 724, 727 (2d Cir.1984).

**2.** In *Maxfield v. Sinclair Int'l*, 766 F.2d 788, 795 (3d Cir.1985), the Third Circuit expressly stated that the ADEA allows for front pay awards.

[her] duty to mitigate damages, it is clear that [s]he 'need not go into another line of work, accept a demotion, or take a demeaning position.'" *Id.* at 1274 (quoting *Ford Motor Co. v. EEOC,* 458 U.S. at 231, 102 S.Ct. at 3065). As discussed in this Court's previous memorandum opinion dated May 10, 2000, "[w]hile Plaintiff did not take a computer programming position, even her former employer now agrees that such a position would not be equivalent to her work as a scientist." (Mem. Op at 11). Therefore, the duty to mitigate did not compel Plaintiff to seek positions as a computer programmer or just any job listed in the local wanted ads under the rubric of "Professionals." She was discharged from the position of a senior scientist and, therefore, was required to exercise reasonably diligent efforts to seek and accept substantially equivalent employment to that position. The record indicates that, from the date of her discharge, Plaintiff contacted multiple employment agencies and applied to a number of employers on a regular basis. Equally important, "[o]btaining a part-time job in another field satisfies Plaintiff's obligation to mitigate damages absent a showing by [the employer] that this action was not in good faith." *Rigidply Rafters, Inc.,* 984 F.Supp. at 390. Having relocated to Massachusetts in order to obtain two part-time teaching jobs, Plaintiff has shown appropriate mitigation. *See E.E.O.C. v. Massey Yardley Chrysler Plymouth, Inc.,* 117 F.3d 1244 (11th Cir. 1997) (rejecting defendant's argument that a plaintiff who had moved from Florida to Tennessee after a fruitless, year-long search for work in Florida had removed herself from the job market to travel). Even after obtaining this lower paying employment, Plaintiff continued to apply for positions commiserate with her qualifications and skills. Thus, Defendant has not sustained its burden of establishing a failure to mitigate or lack of good faith. *See Brady,* 753 F.2d at 1273.

■ On the question of liquidated damages, Defendant argues that Plaintiff's receipt of $75,000 in liquidated damages undercuts the appropriateness of a front pay award. In opposite, Plaintiff denies that the offer of partial summary judgment that she accepted segregated the $150,000 award for back pay and liquidated damages in such a manner. Rather, she contends that the allocation of $75,000 to liquidated damages was for tax purposes at her request. Regardless of Plaintiff's purpose for having the $150,000 award apportioned in the manner requested, it remains undisputed that she received a payment of $75,000 for liquidated damages from Defendant. Nonetheless, most of the parties' discourse on this nuance is rather irrelevant. An award of liquidated damages under the ADEA does not negate the availability of front pay, as the former is punitive in nature and the latter replaces equitable relief. *See Newhouse v. McCormick & Co., Inc.,* 110 F.3d 635 (8th Cir. 1997) ("The jury's finding of willfulness and the resulting award of liquidated damages simply does not affect the district court's determination of appropriate equitable relief."); *Graefenhain v. Pabst Brewing Co.,* 870 F.2d 1198 (7th Cir.1989); *Castle v. Sangamo Weston, Inc.,* 837 F.2d 1550 (11th Cir.1988). Rather, a substantial amount of liquidated damages may be a consideration in determining whether the plaintiff has been made whole. While objectively speaking $75,000 is a considerable amount of money, the Court believes that the amount is insufficient to make Plaintiff whole for the abrupt and prolonged hiatus of her career ensuing from her discriminatory discharge. Therefore, the Court finds an award of front pay is appropriate and necessary to make the Plaintiff whole.

### 3. Calculation of the Front Pay Award

In calculating her front pay damages, Plaintiff estimates that she would have worked for Defendant over the next 15 years. Her anticipated work life would be multiplied by the total of her former salary of $49,753 plus the value of her employment benefits amounting to $66,337 adjusted annually with a 4.13% salary increase.

From this calculation, Plaintiff arrives at a figure of $1,576, 757.90 minus her mitigation income of $450,000 (her current salary of $30,000 multiplied by 15).

■■■ "[T]he ADEA demands 'the most complete relief possible' toward putting the victim of age discrimination back into the position he would have been in but for the unlawful discrimination." *Fariss v. Lynchburg Foundry*, 769 F.2d 958, 965 (4th Cir.1985) (quoting *Spagnuolo v. Whirlpool Corp.*, 717 F.2d 114, 118 (4th Cir.1983)). Front pay is intended to provide equitable relief for "a reasonable future period required for the victim to reestablish her rightful place in the job market." *Hurst v. Beck*, 771 F.Supp. 118, 123 (E.D.Pa.1991). In *Barbour v. Merrill*, 48 F.3d 1270, 1280 (D.C.Cir.1995), the court identified the following factors to be considered in determining the amount to be awarded as front pay: (1) the plaintiff's age; (2) the reasonableness of the plaintiff's intention to continue employment with the employer; (3) the length of time persons in similar positions have stayed with the employer; (4) the plaintiff's efforts at mitigation of damages (including consideration of the current job market and the amount of time reasonably required for the plaintiff to secure comparable employment); and (5) the employer's proof as to the anticipated length of the plaintiff's employment.

Plaintiff claims that, at age 55, she will not be able to obtain comparable employment and, thus, her front pay period should end at her anticipated retirement age of 70. In the absence of evidence setting a definite end to the front pay period, one court assigned a one-year period as the appropriate time frame for the plaintiff to seek comparable work. *See Rigidply Rafters, Inc.*, 984 F.Supp. at 392. However, the plaintiff in *Rigidply Rafters, Inc.* did not engage in the type of highly specialized work as Plaintiff, to which the universe of available comparable positions would be decidedly smaller. Other courts have considered the closeness of the plain-

tiff to retirement in establishing the end of the front pay period. *See Lewis v. Federal Prison Industries, Inc.*, 953 F.2d 1277, 1280 (11th Cir.1992) (setting front pay period at four years when plaintiff would have been subject to mandatory retirement age); *Blum v. Witco Chemical Corp.*, 829 F.2d 367, 376 (3d. Cir.1987) (front pay period of eight years when plaintiffs were expected to retire at that time).

Given the fruitless results of her four-year search and her age of 55, Plaintiff would appear to fall within this category if the average retirement age of 65 is presumed. However, the Court believes that, with her excellent credentials and strong work ethic, Plaintiff can attain and prosper in suitable employment before she reaches her anticipated retirement age of 70. Still, the Court notes that her advanced age and senior status may limit the available offers of comparable employment, thereby extending her employment search beyond average time frames.

In addition, the circumstances of Plaintiff's employment at Hughes strongly suggest that she could not realistically expect to hold her former position until retirement. While Plaintiff argues that she could expect employment at Defendant over the next fifteen years, she also states that her former group may not exist in a few months if the ozone group is . not awarded the NASA contract. It seems axiomatic that Plaintiff could not have reasonably expected to work for Defendant until her retirement given such employment's dependency on the award of the NASA contract bid. *See Cowan v. Strafford R–VI School District*, 140 F.3d 1153 (8th Cir.1998). Additionally, Plaintiff acknowledges that Defendant has been subjected to significant funding cut backs. "A front pay award may be inappropriate when, because of a company's deteriorating financial condition and ongoing work force reductions, there is little likelihood that the plaintiff's employment would have continued into the future." *Downes v. Volkswagen of America, Inc.*, 41 F.3d

1132, 1142 (7th Cir.1994). However, such considerations may limit the time frame for fashioning a front pay award, not necessarily foreclosing its availability. *Id.* (reducing front pay award from eight-year period requested by plaintiff to three years because plaintiff presented no evidence that he would be willing or able to work that long and because the employer's financial difficulties rendered any front pay award speculative). In this case, Plaintiff's reply memorandum stated that Plaintiff's former group did lose its NASA contract during the briefing of this motion. Although the loss of the contract provides for the possibility that the Plaintiff could have lost her job within a matter of months from the order of partial summary judgment, her level of expertise and long tenure as an employee of Defendant indicates that she would have been one of the research scientists transferred to another contracting group. Absent the discriminatory circumstances of her dismissal and the ensuing hostilities of this litigation, the Court believes that Plaintiff would have been transferred to the new ozone group which the Defendant admits holds a contract that extends over the next several years. Giving consideration to Plaintiff's exceptional level of professional expertise, her age, and the results of her current job search, the Court concludes that four years represents sufficient time for Plaintiff to obtain comparable employment or "retraining ... if that course is the one more suited to making ... her whole." *Duke*, 928 F.2d at 1423.

Next, the Court must consider the appropriate salary upon which to base its front pay award. Plaintiff asks this Court to apply her prior salary plus the value of her lost employment benefits in determining her front pay award. The Court agrees that Plaintiff's past salary is the proper basis for determining the her front pay award. *See Cline v. Roadway Exp., Inc.,* 689 F.2d 481, 489 (4th Cir. 1982). The Court also agrees that the value of her lost fringe benefits and salary

increases over the past four years should factor into the equation. "Overwhelming judicial authority recognizes that employers guilty of discrimination are liable for fringe benefits they would have provided to employees as well as back wages under the ADEA." *Fariss,* 769 F.2d at 964. At the time of Plaintiff's discharge, her annual salary was $49,753.60. In the years prior to her dismissal, Plaintiff received merit increases averaging to approximately 4.13%. (*See* Pl. Opp'n Def. Mot. Summ. J., Ex. 13.) Applying this rate to Plaintiff's prior salary over the last four years gives rise to an estimated current salary of $58,674.15. Plaintiff relies on *Stratton v. Dept. for Aging of New York,* 922 F.Supp. 857, 867 (S.D.N.Y.1996) for the proposition that this Court should assume that her employment benefits are valued at 35% of her salary. However, in that case, the plaintiff had presented evidence at trial which supported her estimation of the value of the lost employment benefits. *Id.* In this case, the Court can find no evidentiary basis for estimating the value of Plaintiff's lost employment benefits. Although the Court agrees that Plaintiff is entitled to have the value of her lost fringe benefits included in the front pay award, she also has the burden of proffering evidence that substantiates her request. The record before the Court is devoid of such evidence. In the absence of evidence reflecting any valuation of the lost fringe benefits, the Court will calculate her front pay award based upon her estimated current salary of $58,674.15.

Having come to a determination of the appropriate front pay period and figure reflecting Plaintiff's anticipated lost wages and benefits, the Court must subtract Plaintiff's anticipated earnings achieved through mitigation. Plaintiff's current salary at her two part-time teaching positions averages to approximately $30,000. The Court expects that she will continue to hold these positions until she obtains comparable employment. Her current positions provided no additional fringe benefits to be subtracted from her award.

The final issue before the Court concerns determining the present value of the stream of income due to Plaintiff over the next four years. "An economically accurate measure of [a plaintiff's] lost future income would include his expected salary over [a specified number of] years including expected pay raises, with each year's sum discounted to present value through the use of an appropriate discount rate, which represents the value of having the money now rather than later. A reasonable approximation of this figure can be obtained by simply multiplying his present salary by [the specified number of years] and neither including future pay raises nor applying a discount rate." *Jackson v. City of Cookeville*, 31 F.3d 1354, 1361 (6th Cir. 1994). *See also Stratton v. Dept. of the Aging*, 132 F.3d 869 (2d Cir.1997) (discounting to present value is not required where district court did not factor future salary increases into front pay award); *Gusman v. Unisys Corp.*, 986 F.2d 1146, 1147–48 (7th Cir.1993). The Court finds that, in this case, this "total-offset method" provides a reasonable estimate of Plaintiff's lost future income. Given the relatively short duration of its award, the Court believes that presupposing salary increases over the next four years only to discount the award to account for the time value of money presents a rather redundant venture. *See generally Prine v. Sioux City Community School Dist.*, 95 F.Supp.2d 1005, 1015 (N.D.Iowa 2000). Therefore, the Court will not apply either future salary increases from the date of this opinion nor a discount rate to the stream of payments over the next four years. After applying the appropriate deductions, the Court shall award Plaintiff $114,696.60 in front pay.

### D. *Attorneys' Fees and Costs*

■ Plaintiff claims the following hours for her representation: Jeffrey Bernbach—201.70 hours; Jason Bernbach—456.20 hours; Fred Allentoff—14.10 hours; Sharon Panarese—3.50 hours; Lorin Bleecker—4.35 hours. The request gives rise to an award of $174, 767.85 in attorneys' fees. The ADEA incorporates the fee award provisions of the Fair Labor Standards Act (FLSA). *See* 29 U.S.C. §§ 626(a); 626(b). Upon the showing of a violation, the FLSA instructs courts to award the plaintiff attorneys' fees and costs in addition to any judgment awarded against the employer. 29 U.S.C. § 216(b). Although the statutory source for the award of attorneys' fees and cost originates in the FLSA, federal courts have looked to the treatment of fee requests under the Civil Rights Attorney's Fees Award Act as a model for evaluating requests for fees under the ADEA. Thus, the court may only award attorneys' fees and cost to a prevailing plaintiff.

Defendant concedes that plaintiff is the prevailing party in this action and, therefore, entitled to attorneys' fees. Defendant does not dispute Plaintiff's request for $5,227.22 in costs. The parties agree to the hourly rates set for Fred Allentoff (local counsel), Sharon Panarese (paralegal of Allentoff), and Lorin Bleecker (Plaintiff's prior counsel). However, Defendant contends that Plaintiff is entitled to only 50% of the hours recorded by her attorneys. Furthermore, Defendant disputes the proposed hourly rates for Jeffrey Bernbach and Jason Bernbach, who seek $400 and $200 per hour respectively. Instead, Defendant proposes that their hourly rate be set at the maximum hourly rate set forth in the District Court's Rules and Guidelines for Determining Lodestar Attorneys' Fees in Civil Rights and Discrimination Cases. Defendant devotes its argument to attacking the petitioned hours for the Bernbachs, but provides little justification for reducing the petitioned hours of Fred Allentoff, Sharon Panarse, or Lorin Bleecker. The proposed deductions of Defendant give rise to a total award of $63,522.00 in attorneys' fees.

### 1. *Lodestar Analysis*

A court's award of reasonable attorneys' fees is the product of the reasonable hours

expended multiplied by a reasonable hourly rate. In assessing the reasonableness of the hours and rate claimed, the court considers the following twelve factors elucidated in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (1974) and adopted by the Fourth Circuit in *Barber v. Kimbrell's, Inc.*, 577 F.2d 216, 226 n. 28 (4th Cir.1978): "(1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of the litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorneys' fees awards in similar cases." *EEOC v. Service News Co.*, 898 F.2d 958, 965 (4th Cir.1990) (quoting *Barber*, 577 F.2d at 226 n. 28). *See also Blum v. Stenson*, 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984); *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983); *Criswell v. Western Airlines, Inc.*, 709 F.2d 544 (9th Cir.1983) (applying standard to ADEA case). "[T]hese factors should be considered in determining the reasonable rate and the reasonable hours, which are then multiplied to determine the lodestar figure which will normally reflect a reasonable fee." *Service News, Co.*, 898 F.2d at 965. Plaintiff acknowledges that the nature and length of the professional relationship between she and her attorneys and the absence of any attendant time limitations do not support her petition for attorneys' fees. Likewise, there is no dispute as to the extensive experience, reputation and ability of Plaintiff's attorneys. Defendant acknowledges that Plaintiff's attorneys are "experienced and able." The Court agrees. Thus, the Court shall focus

its remaining review of Plaintiff's petition on the remaining nine (9) factors.

### 2. *Reasonableness of Hours*

▉ Defendant argues that Plaintiff's "limited success" in pursing her claim justifies a 50% reduction in hours. Specifically, Defendant states that Plaintiff experienced limited success because her claim under the Maryland Fair Employment Act was dismissed and her award of $150,000 is small in comparison to the more than $1,000,000 in damages initially sought. The Supreme Court has held that the fee "should not be reduced simply because the plaintiff has failed to prevail on every contention raised in the lawsuit." *Hensley*, 461 U.S. at 435, 103 S.Ct. 1933. *Compare Wal–Mart Stores, Inc. v. Barton*, 223 F.3d 770 (8th Cir.2000) (refusing to further reduce an award of over $116,000 to a plaintiff who was awarded $25,000 on a sexual harassment claim, but was unsuccessful on five related claims, because the plaintiff had succeeded on the claim that was at the "heart of her case" and "served to vindicate important personal rights as envisioned by the statute."); *Buffington v. Baltimore County*, 913 F.2d 113, 128 (4th Cir.1990) (stating that, if all claims do not succeed, but all claims are "inextricably intermingled," the court should assess significance of overall relief obtained in relation to the hours expended); *Perdue v. City University of New York*, 13 F.Supp.2d 326, 346 (E.D.N.Y.1998) (refusing to reduce award even though plaintiff did not prevail on hostile work environment and Title IX claims and did not receive the amount of damages requested); *Bruno v. Western Elec. Co.*, 618 F.Supp. 398 (D.C.Colo.1985) (stating hours spent on unsuccessful related claim that arose out of common core of facts should not reduce ADEA plaintiff's award) *with Ford v. Rigidply Rafters, Inc.*, 999 F.Supp. 647, 651 (D.Md.1998) (reducing the award from the requested amount of $56,343.00 to $20,000.00 where the Plaintiff prevailed on only two of the eight original claims and,

despite Plaintiff's demand for $1,000,000 in damages, the jury awarded only $15,000). While rejecting "the calculation of attorneys' fees by means of a purely mathematical comparison between the number of claims pressed and the number prevailed upon," the Fourth Circuit stated an appropriate inquiry may look to the relationship between the various related claims raised and the degree of overall success obtained. *Brodziak v. Runyon,* 145 F.3d 194, 197 (4th Cir.1998). Likewise, the relatedness between the amount requested and the degree of success attained factors into the analysis. *See Hensley v. Eckerhart,* 461 U.S. 424, 436, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983); *McDonnell v. Miller Oil Co.,* 134 F.3d 638, 641 (4th Cir.1998). Equally important, an attorneys' fees award is not necessarily unreasonable merely because it exceeds the plaintiff's recovery. *See Riverside v. Rivera,* 477 U.S. 561, 574–80, 106 S.Ct. 2686, 2694–97, 91 L.Ed.2d 466 (1986). "[A] civil rights plaintiff seeks to vindicate important civil and constitutional rights that cannot be valued solely in monetary terms." 477 U.S. at 574, 106 S.Ct. at 2695.

In the instant action, Plaintiff's counsel secured an order of partial summary judgment with an award of $150,000 representing back pay and liquidated damages. The state law claim was dismissed early in the action. Furthermore, the 9.5 hours attributable to advancing the related state law claim were not even included in Plaintiff's petition for fees. The $150,000 award represents a significant amount of success on Plaintiff's main claim of age discrimination. Yet, in the wake of the amount of damages originally sought, the Court believes that the award does not represent the excellent results justifying full compensation. Accordingly, the Court will reduce the hours spent in pursuit of that award by five percent (5%).

Defendant also maintains that Plaintiff's counsel expended an excessive amount of time to the case in learning the relevant local law and writing lengthy briefs. In evaluating the reasonableness of the number of hours devoted to a particular task, the Court should consider "factors [that] relate to duplication of effort, overuse of discovery, and conduct of the litigation as a whole from the point of view of a cost-conscious client." *Vaughns v. Board of Educ. of Prince George's County,* 598 F.Supp. 1262, 1277 (D.Md.1984) (finding expenditure of 6,000 hours by attorneys for plaintiffs in school desegregation action was not beyond the bounds of reason).

First, Defendant argues that Plaintiff should not be reimbursed for any time her counsel spent learning the particulars of Fourth Circuit employment discrimination law. In support of its position, Defendant cites three cases. The Court finds that the cases cited by Defendant do not support a 50% reduction in hours. In *Perdue v. City University of New York,* 13 F.Supp.2d 326, 346 (E.D.N.Y.1998), the court reduced the plaintiff's fee request by 20% to account for the hours billed for general education in employment discrimination and the redundancy in hours billed. This case is distinguishable in two respects. First, the twenty percent (20%) reduction reflected the court's objection to the redundant and overlapping hours billed by the three partners and six associates that worked on the case. *Id.* In the present action, such rampant overlapping and redundancy between the attorneys involved did not occur. Second, the *Perdue* court acknowledged that the plaintiff's attorneys were "entitled to reasonable compensation for time spent in researching employment discrimination law," but objected to fully compensating them for their general education in employment discrimination law. *Id.* Plaintiff's counsel did not bill hours for general education in employment discrimination law, but rather researching the particulars for pressing employment discrimination claims in the Fourth Circuit.

In *Gudenkauf v. Stauffer Communications, Inc.,* 953 F.Supp. 1237, 1244 (D.Kan.1997), the court reduced the plaintiff's award by thirty percent (30%) for

billing of excessive hours, billing of duplicative services, and time spent researching well-settled case law. In *Gudenkauf*, plaintiff's attorneys billed approximately 73 hours toward background research. *Id.* In the present case, Jason Bernbach claimed approximately 29.2 hours toward researching Fourth Circuit law and issues raised in Defendant's motion for summary judgment. Of the 3.50 hours claimed by Fred Alentoff's paralegal, Sharon Panarese, 2.80 hours were attributable to researching Fourth Circuit law. Thus, approximately 32 hours or approximately five percent (5%) of Plaintiff's counsels' time was spent familiarizing themselves with the Fourth Circuit law. This is less than half of the number hours claimed in *Gudenkauf*. Recognizing that performing substantive legal research is proper expenditure of time and considering that the actual time attributed to such research was limited in scope and time, a reduction of five percent (5%) in the hours of Jason Bernbach appears warranted under the circumstances.

■ As to the length of Plaintiff's memoranda, Congress enacted fee-shifting legislation for successful civil rights litigants because effective legal representation shied away from the minimal monetary prospects of civil rights cases. *See generally Quaratino v. Tiffany & Co.*, 166 F.3d 422 (2d Cir.1999). Thus, Congress recognized that civil rights plaintiffs are entitled to the same level of zealous representation retained by civil rights defendants. The development of thoroughly-researched, well-written, and effective briefs are not excessive or redundant merely because the defendant believes the memoranda could have accomplished the same task with fewer pages.

■ Additionally, a defendant who requires the plaintiff to expend substantial time in responding to multiple motions can hardly be heard to complain as to the amount of time spent on responding to such motions. *See Lipsett v. Blanco*, 975 F.2d 934, 938–39 (1st Cir.1992). Defen-

dant pursued a multifaceted defense advancing numerous reasons for Plaintiff's discharge. In order to survive Defendant's motion for summary judgment, Plaintiff's counsel had to produce evidence discrediting these reasons. Furthermore, they needed to produce additional evidence of discrimination under the more rigorous "pretext plus" standard recently extinguished by the Supreme Court in *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). In light of these considerations, the Court finds that the efforts of Plaintiff's counsel were not excessive, but reasonable under the circumstances.

As to the novelty and difficulty of the case, Plaintiff agrees that the questions presented in her age discrimination claim where not novel, but argues that particular circumstances of her claim raised difficult questions. Even in the absence of novel questions, an expenditure of significant hours may be reasonable where "the case certainly posed difficulties from an evidentiary standpoint and required a high degree of skill to win." *See Herold v. Hajoca Corp.*, 682 F.Supp. 297, 300 (W.D.Va. 1988). As discussed earlier, Plaintiff's claim dealt with the relative qualifications of research scientists specializing in physics and algorithmic science. The defense required a comparison of Plaintiff's abilities in 13 different areas to the other scientists in her former group. The Court believes the number of hours expended are reasonable in light of the factual complexity of the case and extensive discovery involved in pressing Plaintiff's claim.

### 3. *Guideline Violations*

The District Court's Rules and Guidelines for Determining Lodestar Attorneys' Fees in Civil Rights and Discrimination Cases provide that "[o]nly one lawyer is to be compensated for attending depositions ... client and third party conferences ... attending hearings ... [and] intra-office conferences." Local Rules of the United States Dist. Ct. of the Dist. of Maryland

app. B at §§ 2(a)-(e). Plaintiff admits that she claimed the time of both lawyers for purposes that only allow for billing of one. Plaintiff concedes that 34.8 hours of Jason Bernbach's claimed time was attributable to such oversights. Accordingly, the Court shall reduce this time from his claimed hours. The Court will not apply this limitation to the conferences with local counsel and the substitution thereof as these communications fell within the typical function of local counsel and were necessary for the effective representation of Plaintiff. *See Burston v. Virginia,* 595 F.Supp. 644, 649 (E.D.Va.1984); *Wehr v. Burroughs Corp.,* 477 F.Supp. 1012 (E.D.Pa.1979) (substitution of counsel). Jeffrey Bernbach's travel hours exceed the two-hour time allowance provided in the Court's Guidelines. Pursuant to § 2(f) of the Guidelines, the Court shall bill the excess of six hours at half of Jeffrey Bernbach's reasonable hourly rate.

#### 4. *Reasonable Hourly Rate*

 The reasonable hourly rate is based on the prevailing market rate commanded by lawyers of similar skill, experience, and reputation in the relevant community. Pursuant to this Court's guidelines on fee petitions, the prevailing market rate for attorneys of Jeffrey Bernbach's experience is $190–225. Local Rules of the United States Dist. Ct. of the Dist. of Maryland app. B at § 3. As a lawyer admitted to the bar for less than eight years, the prevailing market rate applicable to Jason Bernbach is $135–170. *Id.* Plaintiff asks this Court to apply her attorneys' customary hourly rates of $400 for Jeffrey Bernbach and $200 for Jason Bernbach instead of the prevailing market rates of this jurisdiction. Courts have looked to the prevailing market rate outside of the local community in exceptional circumstances where the litigation was complex or the plaintiff was unable to obtain local counsel. *See Turner v. Secretary of Air Force,* 944 F.2d 804, 809 (11th Cir.1991) (stating that persuasive evidence of plaintiffs' inability to retain local coun-

sel could justify application of a national market rate). However, where an attorney knowingly accepts a client that will entail primarily litigation in another jurisdiction, the prevailing community rate of that jurisdiction should be applied. *See Adcock–Ladd v. Secretary of Treasury,* 227 F.3d 343, 350 (6th Cir.2000).

 Plaintiff urges this Court to adopt the hourly rates attributed to her attorneys by the district court in *Fine v. Interpublic Group of Cos.,* No. 94 CIV. 4419(PKL), 1997 WL 7583 at *6 (S.D.N.Y. Jan.9, 1997). In *Fine,* Plaintiff's counsel sought compensation at a rate of $385 per hour for lead counsel Jeffrey Bernbach and $185 per hour for Jason Bernbach. *Id.* The court found the hourly rates requested on behalf of the Bernbachs' to be somewhat higher than the norm. *Id.* At the time, the court considered the prevailing range of hourly rates for lead counsel in similar cases in that jurisdiction to be $175 to $375. *Id.* With that consideration, the court fixed the reasonable hourly rate for Jeffrey Bernbach at $300 and $150 for Jason Bernbach. *Id.* Thus, the set rate was well within the recognized prevailing range for that jurisdiction. Here, Plaintiff asks this Court to assign an hourly rate that exceeds the suggested prevailing wage in this jurisdiction by $175. The Court believes that such a wide departure from the prevailing community standards is not justified under the circumstances.

 Next, Plaintiff emphasizes that the rate charged by Defendant's counsel, Jeffrey Ayers, supports her attorneys' proposed hourly rates of $400 per hour and $200 per hour. According to Plaintiff, Mr. Ayers disclosed to her counsel that he charges $295 per hour for his services. Plaintiff points out that this exceeds Defendant's proposed hourly rate for Jeffrey Bernbach by $70 even though Mr. Bernbach holds significantly more experience than Mr. Ayers in litigating employment cases. One court has ruled that the fees charged by the defendant's counsel is not a

proper consideration, as such an inquiry requires the court to gauge the reasonableness of that counsel's fees as well. *Burks v. Siemens Energy & Automation, Inc.*, 215 F.3d 880, 884 (8th Cir.2000). The Court agrees that such an undertaking would be inappropriate. Rather, the Court believes that the rates established in the Guidelines provides the better barometer for gauging the prevailing market rate for attorneys in this community.

On the issue of lost opportunity costs, Plaintiff argues that the significant time expended by her attorneys in pursuit of her claim necessitated that her attorneys forego acceptance of other clients during the pendency of the litigation. Plaintiff argues that the consumption of considerable resources is supported by the small size of the Bernbach Firm which consists of only two attorneys, Jeffrey and Jason Bernbach. Defendant argues that Plaintiff must cite specific cases declined in favor of pursing her case. Defendant also maintains that, as this case has extended over two years, Plaintiff must be exaggerating the level of her attorneys' commitment to this case. In *Herold v. Hajoca Corp.*, 682 F.Supp. 297, 300 (W.D.Va.1988), the court found that expending almost 600 hours over a four-year period necessarily precluded the Plaintiff's counsel from accepting other cases. Here, Plaintiff's main counsel expended more than 600 hours over two years in advocating her claim. Such extensive commitment of time to one case supports setting their compensation at the highest prevailing rate.

 As to the expectations of Plaintiff's attorneys at the outset of the litigation, Defendant appears to argue that the Supreme Court's ruling in *City of Burlington v. Dague* stands for the proposition that Plaintiff's contingency fee arrangement with her attorneys plays no role in the award of attorneys' fees. In *City of Burlington v. Dague*, 505 U.S. 557, 566–67, 112 S.Ct. 2638, 2644, 120 L.Ed.2d 449 (1992), the Supreme Court held that a contingency fee arrangement does not justify the enhancement of a fee award. The Court reasoned that the lodestar analysis already took into account the risk of loss associated with a contingency fee arrangement in its consideration of the difficultly of the case and the quality of representation. *Id.* at 562–63, 112 S.Ct. 2638. Although *Dague* involved the award of fees under the federal environmental laws, several courts of appeals have applied the rationale to civil rights cases. *See, e.g., Forshee v. Waterloo Indus., Inc.*, 178 F.3d 527 (8th Cir.1999). Thus, while the contingent nature of Plaintiff's fee arrangement may not serve as the basis for *enhancing* a fee award after consideration of the lodestar factors, such considerations are appropriate in *evaluating* the reasonableness of the plaintiff's petition under the lodestar analysis. Here, Plaintiff's counsel entered into a contingency fee agreement that lawyers in this jurisdiction rejected. Despite the apparent local aversion to Plaintiff's case, her counsel accepted the undertaking under a traditional contingency fee arrangement. As such, the Court believes that her attorneys incurred considerable risks in accepting Plaintiff's case. The Court finds that time devoted to this case and the contingent nature of their remuneration support application of the highest prevailing rate for each of the Bernbachs.

Given consideration of the appropriate lodestar factors, the Court shall grant Plaintiff's petition for attorneys' fees as follows:

| | Hours | Rate | Total |
|---|---|---|---|
| Jeffrey Bernbach, Esq. | 194.5 | $225.00 | $ 43,762.50 |
| § 2(f)(iii) allowance | 6.0 | $112.50 | $ 675.00 |
| Jason Bernbach, Esq. | 395.0 | $170.00 | $ 67,150.00 |

| | | | |
|---|---|---|---|
| Fred Allentoff, Esq. | 14.1 | $175.00 | $ 2,467.50 |
| Lorin Bleecker, Esq. | 7.6 | $225.00 | $ 1,710.00 |
| Sharon Panarese (Paralegal) | 3.5 | $ 40.00 | $ 140.00 |
| | | | $115,905.00 |
| Less 5% reduction for results obtained in relation to relief sought | | | − $ 5,795.25 |
| | | | $110,109.75 |

The award of $110,109.75 is the product of the reasonable hours expended applied to a reasonable hourly rate. The award takes into account reductions for Plaintiff's lead counsel becoming familiar with employment discrimination law in the Fourth Circuit, various violations of the District Court's Guidelines, and an additional five percent (5%) reduction given the level of success obtained.

### E. Interest on the Partial Judgment

██ Pursuant to 28 U.S.C. §§ 1961(a)-(b), Plaintiff seeks an additional $1,284.17 in post-judgment interest on the Order for Partial Summary Judgment dated August 9, 2000. Plaintiff calculated the amount based upon a nine percent (9%) interest rate and the ultimate date of full satisfaction of the judgment, September 12, 2000. Section 1961 provides that

> [i]nterest shall be allowed on any money judgment in a civil case recovered in a district court .... Such interest shall be calculated from the date of the entry of the judgment, at a rate equal to the coupon issue yield equivalent (as determined by the Secretary of the Treasury) of the average accepted auction price for the last auction of fifty-two week United States Treasury bills settled immediately prior to the date of the judgment.... Interest shall be computed daily to the date of payment.

28 U.S.C. § 1961(a). Successful civil rights plaintiffs may avail themselves of its provisions. *See Cordero v. De Jesus–Mendez*, 922 F.2d 11, 15 (1st Cir.1990);

*Vaughns v. Board of Educ. of Prince George's County*, 627 F.Supp. 837 (D.Md. 1985). Judgment was entered on August 9, 2000. The date of the last auction period settled prior to judgment was on May 31, 2000, setting the post-judgment interest rate at 6.375%. The Court shall apply this rate, compounded daily, to Plaintiff's $150,000 award over the 35 days it took Defendant to satisfy the entry of partial summary judgment.

### F. Supplemental Petition

Pursuant to 42 U.S.C. § 2000e–5(k), Plaintiff has filed a supplemental petition for attorneys' fees and costs incurred in the filing and defending of Plaintiff's motions for front pay and attorneys' fees and costs. Plaintiff requests an additional 107.9 hours for time expended in responding to Defendant's opposing memoranda with 11.1 hours attributable to Jeffrey Bernbach and 96.8 hours expended by Jason Bernbach. Defendant argues that Plaintiff's supplemental request should be reduced by 50% because Plaintiff's reply memoranda espoused arguments that Court should reject.

██ A litigant may recover additional attorneys' fees for time spent in preparing and defending an attorneys' fees application. *Daly v. Hill*, 790 F.2d 1071, 1080 (4th Cir.1986). Ordinarily, courts allow for modest expenditures of time for post-trial motions and the preparation of fee applications. For example, in the absence of a dispute, a fee request for 37.9 hours spent in preparing and arguing plaintiff's peti-

tion for attorney fees was excessive. *Daly v. Hill,* 790 F.2d at 1080. Likewise, in *E.E.O.C. v. Service News Co.,* 898 F.2d 958, 966 (4th Cir.1990), the Fourth Circuit held that, where the legal questions were not difficult and the case was not complex, it was unreasonable to devote more than twenty percent (20%) of the time expended for the main representation toward preparing a petition for attorneys' fees.

 In this instance, Plaintiff's request for additional fees represents the time expended in assembling her motions for front pay and attorneys' fees. Both motions were strenuously objected to by Defendant. Defendant asserted multiple grounds for denying Plaintiff's motion for front pay in its entirety and cutting her request for attorneys' fees by over 60%. Yet, the amount of time expended in preparing and defending Plaintiff's motions appears to be rather excessive. The issues involved were not complex and involved text book applications of existing precedent. The limited issues presented in Plaintiff's petitions simply cannot justify the hours expended by Jason Bernbach. In addition, Jason Bernbach's claimed hours in the supplemental petition exceed the one-fifth cap set forth in *News Service Co.* Accordingly, the Court shall reduce Jason Bernbachs' claimed hours in the supplemental petition by 40% to 58.1 hours. As discussed earlier, the attorneys are entitled to the highest prevailing hourly rates in this jurisdiction. The reductions in hours and claimed hourly rates give rise to an award of $12,374.50 as follows:

| | Hours | Rate | Total |
| --- | --- | --- | --- |
| Jeffrey Bernbach | 11.1 | $225 | $2,497.50 |
| Jason Bernbach | 58.1 | $170 | $9,877.00 |

Plaintiff seeks additional costs of $1,998.35 incurred by her attorneys and $2,195.45 for other expenses incurred by her. Defendant does not object to the Plaintiff's supplemental petition for costs. The Court believes the claimed costs are reasonable and shall award Plaintiff the requested amount in full.

### III. CONCLUSION

For the reasons stated above, the Court will grant-in-part Plaintiff's motion for front pay and award Plaintiff an amount of $114,696.60. Pursuant to this *Court's* order of partial summary judgment, Plaintiff is entitled to post-judgment interest computed in accordance with 28 U.S.C. § 1961. The *Court* shall *grant-in-part* Plaintiff's initial and supplemental petitions for attorneys' fees. The Court's supplemental award of attorneys' fees added to its initial award of $110,109.75 gives rise to a total attorneys' fees award of $122,484.25. Adding Plaintiff's supplemental petition for costs to her initial request of $5,227.22 results in a total award of $9,421.02 in costs. An Order consistent with this Opinion will follow.